[65 NYS3d 508]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EQUAN SOUTHALL, Appellant.

First Department, November 28, 2017

112

**APPEARANCES OF COUNSEL**

*Robert S. Dean, Center for Appellate Litigation*, New York City (*John Vang* of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Ross D. Mazer* and *Hilary Hassler* of counsel), for respondent.

**OPINION OF THE COURT**

Tom, J.

In this appeal, we must consider whether a juror's failure to disclose that she applied for the position of Assistant District Attorney with the New York County District Attorney's Office, the same office that prosecuted defendant, two days before being sworn as a trial juror, deprived defendant of his right to a fair trial, and whether Supreme Court abused its discretion in denying defendant's posttrial motion to vacate the judgment of conviction. For the following reasons, we find that the juror's failure to disclose her application did deprive defendant of a fair trial, and that Supreme Court abused its discretion as a matter of law when it denied defendant's motion to vacate pursuant to CPL 440.10. Accordingly, we now grant the motion to vacate the judgment and remand the matter for a new trial.

In 2011, defendant was charged with murder in the second degree for killing his girlfriend. At trial, since defense counsel conceded that defendant truthfully confessed to killing the victim, the central issue was whether defendant suffered from an extreme emotional disturbance which would reduce the conviction to first degree manslaughter. The jury ultimately convicted defendant of murder in the second degree, and he was sentenced to a prison term of 23 years to life.

During the April 11, 2014 voir dire, the court gave general instructions to the juror at issue and other prospective jurors, stating that "the jury must be fair" and that "[a] fair juror is a person who starts out with no view in favor or against the People or defendant," and "who, without fear, favor, bias, preju-

dice, or sympathy for either the People or the defendant . . . renders a verdict of guilty or not guilty." The court told the jury panel that the court needed to decide "[w]hether there's anything about you that might impact your ability to be a fair and impartial juror in this case." The questions on the panelists' questionnaire included whether they had "been employed by a law enforcement agency or police," whether they had "any business pending" before a police or law enforcement agency, and whether there was "any reason why [they] could not be a fair and impartial juror in this case." The panelists were also asked a catch-all question about whether anything else relevant came to mind.

On April 14, 2014, the juror told the court that she was "employed as an attorney" at "a large law firm doing corporate litigation, white col[la]r defense and securities." In response to the court's questions about her work, the juror said that she had been an attorney for about 18 months, that "part of [her] practice involve[d] criminal law," that she had "some specialized knowledge about criminal law," and that her practice was largely federal. She confirmed that she would follow the court's instructions and not apply any of her own specialized knowledge. When asked if she thought she would "be able to be a fair juror in this case," she said, "Yes." The juror also reported in an answer on the questionnaire, "I previously was employed by the U.S. Attorney's [O]ffice here in Manhattan. I was a paralegal specialist before I went to law school." The court asked if this work focused on criminal justice, and the juror said, "Yes, narcotics unit."

In response to another question on the questionnaire, the juror stated, "I don't have any business matters pending before an agency or court." She further stated, "There's no reason why I couldn't be fair and impartial." In response to the catch-all question, she said, "There's, also, nothing else."

Defense counsel noted that the juror "spent a lot of time with federal prosecutors at 500 Pearl Street," and asked her if anything "about [her] experience would make [her] impartial," and the juror said, "No," presumably assuming that counsel meant "biased" instead of "impartial." When counsel asked if the juror's "prosecutor background" "would affect" her in this case, the juror responded:

> "No, when I worked [at] the U.S. [A]ttorney's [O]f-
> fice I worked with a variety of different federal

agencies. And I worked with cooperating witnesses, many of whom came from different backgrounds and rap sheets, and had certain things in their past. So I sort of worked with people on both sides, and had positive . . . interactions with both. And there's nothing about that entire array of experiences that would make me be unfair or impartial in evaluating the witnesses."

Defense counsel asked the juror a follow-up question about whether the "cooperating witnesses" she had mentioned, who may have had "horrible backgrounds" and "committed the crimes they're being accused of and 10,000 other crimes," nevertheless "have the right to come in and get on the witness stand and be believed." The juror responded, "Yeah."

After notifying the juror and others that they had been selected for the jury, the court instructed them to "remember all of the rules" stated earlier. The jury was sworn on April 18, 2014.

After swearing in the prospective jurors, the court invited them to speak with the court privately if they had "some concern or problem" with serving, and asked whether there was "anything else about [their] possible jury service" to discuss, including "anything else that . . . [it] ha[d] not already asked about." The juror did not do so at any time.

Eight months after defendant was sentenced, one of the two Assistant District Attorneys (ADA) who tried this case, Craig J. Ortner, sent a letter to the court and the defense, dated January 22, 2015, disclosing that one of the jurors who convicted defendant, the juror, had been hired by the District Attorney's (DA) Office as an ADA. He noted that the juror submitted an online application for that position on April 16, 2014—two days after she was questioned as a prospective juror, but two days before she was sworn as a juror. He added that the juror's application did not mention her jury service, and that neither he nor his cocounsel was aware of the application anytime during trial. He further stated that after the trial concluded, on April 29, 2014, the juror completed four interviews with the DA's Office beginning on May 20, received an employment offer on July 8, and started working there on September 2, 2014.

Following this disclosure, defendant moved to vacate the judgment of conviction pursuant to CPL 440.10 (1) (f) and (h), based on the prejudicial conduct of the juror's failure to inform

the court of her pending job application to the New York County District Attorney's Office during the jury selection process. On February 19, 2016, a hearing was held on the motion at which the juror and defendant's trial counsel, Patrick Brackley, testified.

At the 440 hearing, the juror testified that at the time of trial, she was a 28-year-old litigation associate at a large firm, who had been admitted to the bar in 2013, and graduated from law school in 2012. The juror, who had worked at the US Attorney's Office as a paralegal, did not want to spend her whole career at a firm. Thus, in February 2014 she started applying for jobs, primarily federal judicial clerkships in New York. At the time of voir dire, she had an "interest in one day pursuing a career as a prosecutor" because of her "overwhelmingly positive experience" working at the US Attorney's Office before law school, but could not recall "at that moment" having a specific interest in any "particular office." At that time, she had not applied to any prosecutors' offices, although she had applied for a trial attorney position at the antitrust division of the US Department of Justice.

The juror had not received any responses to her clerkship applications, and she recalled that "being called for jury service for the first time . . . and coming down to the court and having the experience of going through [v]oir [d]ire . . . certainly inspired [her] at that time to consider other jobs," including the DA's Office. Accordingly, on April 16, she applied to the DA's Office online. She took "a few hours" tailoring her existing documents to suit this particular application before uploading them to the website. The main document she needed to "personalize" was the cover letter; she kept all of her other documents (a resume, transcripts, and list of references) essentially the same as with her prior applications. She could not remember if she submitted a writing sample at that time or later in the hiring process.

The juror explained that she had interpreted the trial court's instruction not to communicate with attorneys in the case to refer to the individual prosecutors handling the case, not to the DA's Office as a whole. Therefore, she did not inform the court of her application to the DA's Office because "it didn't occur to [her] that . . . submitting an application was something that [she] was supposed to disclose to the court." She stated: "My understanding of the [v]oir [d]ire questions that I had been asked didn't include whether I had hoped, intended, or had any applications for any jobs in particular."

The juror asserted that she answered all voir dire questions truthfully, and did not make any statements she knew (at the time or during the CPL 440 hearing) to be false to the court or counsel during jury selection or trial. She testified that she followed all of the court's instructions to the best of her ability, and never "intentionally fail[ed] to disclose information that [she] believed to be relevant to [her] qualifications to serve as a juror" during jury selection. She was not concerned that disclosing the application might prevent her from serving on the jury.

The juror also denied that she thought about her job application to (or prospective employment with) the DA's Office at all during jury deliberation, and she maintained that her application did not influence her conduct as a juror in this case, including her verdict. In this regard, she stated that she "play[ed] an active role in discussing the case with other jurors." Similarly, she noted that she voted to convict because she "believed that the evidence proved [d]efendant's guilt beyond a reasonable doubt." If she had believed otherwise, she would have "explained" to the other jurors "why [she] came to that conclusion on the basis of the evidence," "insisted" that the jury deliberate about her reasons for believing that the People had not met their burden, and voted to acquit. The juror did her best "to be a fair juror in this case," and had no bias against either party during the trial.

After submitting the application, the juror did not communicate with anyone at the DA's Office until weeks after the trial. When she arrived for her initial interview, on May 20, 2014, a staff member told her that ADA Ortner would interview her, but the juror pointed out that she had recently served on a jury in a case prosecuted by ADA Ortner, who ultimately did not interview her. She never mentioned her jury duty during her four DA's Office interviews.

Defendant's trial counsel, Patrick Brackley, testified that he chose not to challenge the juror because after questioning her about her experience at the US Attorney's Office and her then-current position at a firm where she practiced white-collar criminal defense, counsel Brackley concluded that she would likely be "sympathetic to defense issues." However, if counsel had known that the juror had a pending job application with the DA's Office, counsel Brackley would have "inquired into it" and challenged her for cause; if that were denied, counsel would have used a peremptory challenge.

Supreme Court denied defendant's motion to vacate, finding that the juror's testimony established that her vote in this case

"was not influenced by any bias or prejudice arising from her employment application," and that she did not falsely answer any voir dire questions or violate the court's instructions. In other words, the court found that it had not been shown that the juror exhibited actual bias.

Turning to defendant's claim of "implied bias," the court recognized that "[t]he juror's failure to inform the [c]ourt and the parties on her own about her application when she appeared to begin the trial on April 18, 2014 reflected poor judgment, particularly since [she] was an attorney, who should have realized the application might create an appearance of impropriety." However, the court remarked that it was unaware of any case where implied bias was found to warrant vacating a conviction. In any event, the court found "no extreme circumstances warranting a finding of implied bias," since there was "no reason . . . to believe . . . the juror thought her employment prospects in the DA's [O]ffice would be impacted by her jury verdict," and her "application did not come up during the jury's deliberations."

Article I, section 2 of the New York State Constitution guarantees a trial by jury in criminal cases. Article VI, section 18 (a) of our State Constitution also provides that "crimes prosecuted by indictment shall be tried by a jury composed of twelve persons, unless a jury trial has been waived." But, it is not merely a right to trial by a jury of twelve of our citizens that is among our most valued rights, rather it is the right to a fair trial in front of a fair jury. Undoubtedly, "[f]undamental to our constitutional heritage is an accused's right to trial by an impartial jury" (*People v Johnson*, 94 NY2d 600, 610 [2000]; *see also* US Const 6th Amend).

Indeed, "[n]othing is more basic to the criminal process than the right of an accused to a trial by an impartial jury" (*People v Branch*, 46 NY2d 645, 652 [1979]). As the Court of Appeals has further explained, "The presumption of innocence, the prosecutor's heavy burden of proving guilt beyond a reasonable doubt, and the other protections afforded the accused at trial, are of little value unless those who are called to decide the defendant's guilt or innocence are free of bias" (*id.* at 652).

Because the right to an impartial jury is so critical, a defendant plays a significant role in the selection of the jurors. In fact, "[t]he constitutional right of a criminal defendant to a fair trial includes both the right to be tried by the jury in whose selection the defendant himself has participated, and the right

to an impartial jury" (*People v Rodriguez*, 71 NY2d 214, 218 [1988]). Stated another way, a defendant has a "constitutional right to a trial by a 'particular jury chosen according to law, in whose selection [the defendant] has had a voice' " (*People v Buford*, 69 NY2d 290, 297-298 [1987], quoting *People v Ivery*, 96 AD2d 712 [4th Dept 1983]). In enacting certain provisions of the Criminal Procedure Law, our State Legislature has ensured the defendant's role in that selection and has provided procedural safeguards to ensure the selection of impartial jurors.

Initially, jurors must complete questionnaires about themselves that may reveal bias or other grounds that would prevent them from serving, and both the court and counsel are given opportunities to examine the prospective jurors (CPL 270.15). Individual jurors may be challenged for cause (*see* CPL 270.20) based on demonstrable actual bias, or even in cases of implied bias in which the juror "bears some other relationship to [certain persons] of such nature that it is likely to preclude him from rendering an impartial verdict" (CPL 270.20 [1] [c]).

Even absent cause, defendants are afforded the right to peremptory challenges to a prospective juror "for which no reason need be assigned" (CPL 270.25 [1]). Significant to the right to an impartial jury, "[t]he central function of the right of peremptory challenge is to enable a litigant to remove a certain number of potential jurors, who are not challengeable for cause, but in whom the litigant perceives bias or hostility" (2 Criminal Practice Manual § 54:2). The function is "to eliminate extremes of partiality on both sides, [and] to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise" (*Swain v Alabama*, 380 US 202, 219 [1965]).

As a final failsafe, our procedures provide for the selection of alternate jurors (CPL 270.30), and for the discharge of sworn jurors and replacement by alternate jurors in the cases of incapacity, unavailability, a juror grossly disqualified to serve, or where a juror has engaged in substantial misconduct (CPL 270.35).

■ Here, due to the juror's concealment of material information regarding her job application, which also demonstrated a predisposition in favor of the prosecution, defendant was deprived of an impartial jury comprised of 12 jurors whom he had selected and approved through voir dire. In fact, defendant

was tried by only 11 jurors whom he truly selected and approved; this violated his constitutional right to a jury of 12 of his own choice in a criminal case (NY Const, art VI, § 18 [a]). He was also deprived of exercising the various safeguards put into place by our legislature. As defense counsel testified, had the juror timely disclosed this information he would have moved to strike her for cause, and if unsuccessful would have exercised a peremptory challenge against her (*see People v Howard*, 66 AD2d 670 [1st Dept 1978] [prospective juror's failure to disclose connection to law enforcement agency deprived defendant of right to fair trial; had juror disclosed such information, a for cause challenge would have been sustained or counsel could have used a peremptory challenge]; *see also United States v Colombo*, 869 F2d 149, 151-152 [2nd Cir 1989] [court may presume bias where juror deliberately concealed information; defendant prevented from intelligently exercising his peremptory and causal challenges because of the juror's intentional nondisclosure]). While we recognize that there is no rule requiring automatic reversal in these situations (*see People v Rodriguez*, 100 NY2d 30, 34 [2003]), since the verdict was not returned by a fair and impartial jury and we find the juror would have been subject to removal for cause, we agree with defendant that he was denied a fair trial on the ground that he was not tried by a jury of his own choice. We thus remand for a new trial. Critically, the juror remaining on the jury was prejudicial to defendant because he was ultimately convicted by the jury.

Instructive here is the case of *People v Gajadhar* (9 NY3d 438 [2007]), in which the defendant executed a signed waiver consenting to a verdict rendered by 11 jurors. In that case, after deliberations began, one juror became ill and, to avoid a declaration of mistrial, defendant agreed to the waiver. While our State Constitution permits a waiver of the right to a jury of 12 citizens, it is crucial that the waiver be made knowingly, voluntarily and intelligently. In addition to requesting that the juror be replaced by an alternate juror, perhaps, if the disclosure was made after the jury was sworn but before the verdict, defendant would have consented to a similar waiver in this case. However, as the events unfolded defendant was not given such an opportunity and could not have validly waived his right to an impartial jury of 12 citizens which he selected.

█ Although the motion court decides whether to grant or deny a motion to vacate in its discretion (*see People v Fried-*

*good*, 58 NY2d 467, 474 [1983]), and we defer to the court's credibility determinations, we conclude that the motion court abused its discretion as a matter of law in denying the motion. The motion court employed a too narrow approach to determining whether the juror exhibited actual bias. Notably, CPL 270.20 (1) (b) requires merely proof of a "state of mind that is likely to preclude [a juror] from rendering an impartial verdict." Thus, actual bias "is not limited . . . to situations where a prospective juror has formed an opinion as to the defendant's guilt" (*People v Torpey*, 63 NY2d 361, 366 [1984]).

Actual bias may be demonstrated, inter alia, by failure "to answer honestly a material question on voir dire" (*McDonough Power Equipment, Inc. v Greenwood*, 464 US 548, 556 [1984]), concealing material information from the court (*see United States v Colombo*, 869 F2d at 152), or by manifesting a predisposition in favor of the prosecution (*see People v Brown*, 295 AD2d 184, 185 [1st Dept 2002]).

While the juror did not lie when she was questioned as a prospective juror, she later concealed material information— her application to work for the office prosecuting this case— which, as an attorney with some specialized knowledge of criminal law, she should have known to disclose to the court. Similarly, while the juror may have subjectively believed she was not biased, that her application had no bearing on her ability to be an impartial juror, that she did not consider the effect a not-guilty verdict would have on her prospective employment, and that she followed the court's instructions as she understood them, an objective view of her failure to inform the court of a significant action on her part can not be perceived in the same manner. It is this objective view that matters here, and we find that the record demonstrates that the juror possessed a state of mind likely to prevent her from rendering a fair and impartial verdict.

Indeed, while the juror may have been applying for many legal jobs during that time period she must have known this job application was unique. Significantly, the juror's immediate disclosure of her jury service upon her discovery that one of the prosecuting attorneys on this case was to interview her for her job is telling in that it reveals the juror knew her jury service and job application were connected and, as the motion court stated, raised at the very least an appearance of impropriety. In other words, the failure to disclose the job application to the court demonstrated actual bias. Once again, defense counsel

averred that if he knew of the juror's job application he would have sought her removal for cause or would have used a peremptory challenge. In sum, the motion court's crediting the juror's testimony that she did not think her job application might compromise her impartiality is of no moment under these circumstances.

Further, as the juror herself testified, she was inspired to become a prosecutor by her experience during the voir dire of this matter, which is what compelled her to immediately apply to work at the office that prosecuted this case. It appears that there may have been a predisposition in favor of the prosecution which could have separately warranted a challenge for cause (*see People v Brown*, 295 AD2d at 185).

The motion court and the People rely on *Smith v Phillips* (455 US 209 [1982]) to argue that where a sitting juror applies for a job at the office prosecuting the case and fails to disclose that fact, a defendant is not denied his right to a fair trial. According to the United States Supreme Court, under federal law, the defendant in *Smith* was afforded due process because he had an opportunity to prove actual bias by the sworn juror at an evidentiary hearing. However, *Smith* is distinguishable in that it involved a habeas petition and is inapposite to the state law issues raised in this case. Even accepting that *Smith* established the federal standard, such standard sets the floor and not the ceiling on protections under New York law. As discussed below, New York law offers far greater protections, including the disqualification of jurors for implied bias.

Contrary to the People's contention that a defendant in New York must show actual bias in a postjudgment hearing, and the motion court's related statement that there is no precedent in which the implied bias standard has been used to vacate a conviction through a postjudgment motion, in *People v Rentz* (67 NY2d 829 [1986]), the Court of Appeals granted a postjudgment motion to vacate a conviction on the ground of a juror's implied bias. Accordingly, it is well settled that a juror's implied bias is a sufficient ground to vacate a conviction.

Pursuant to CPL 270.20 (1) (c), a juror may be removed for cause where he or she has a relationship with the defendant, a witness, or counsel for the People or defendant which "is likely to preclude him [or her] from rendering an impartial verdict." "This is referred to colloquially as an 'implied bias' that requires automatic exclusion from jury service regardless of whether the prospective juror declares that the relationship

will not affect her ability to be fair and impartial" (*People v Furey*, 18 NY3d 284, 287 [2011]).

Crucially, such implied bias cannot be cured with an expurgatory oath (*Furey*, 18 NY3d at 287). Indeed, "the risk of prejudice arising out of the close relationship . . . [is] so great that recital of an oath of impartiality could not convincingly dispel the taint" (*Branch*, 46 NY2d at 651). Implied bias "creates the perception that the accused might not receive a fair trial before an impartial finder of fact" (*Furey*, 18 NY3d at 287). For this reason, the Court of Appeals has advised trial courts to exercise caution in these situations by leaning toward "disqualifying a prospective juror of dubious impartiality" (*Branch*, 46 NY2d at 651).

Here, defendant met his burden of establishing the juror's implied bias. The nature of the parties' relationship is to be considered in determining whether disqualification is necessary (*Furey*, 18 NY3d at 287). While the juror did not have any direct contact with the ADAs assigned to the case, and did not initially reveal her jury service in her job application, the fact remains that just two days after being questioned in voir dire, and two days before she was sworn as a juror, the juror spent hours on her application to the same office prosecuting defendant, in which she attempted to persuade that office to hire her as a prosecutor. The juror admitted at the CPL 440 hearing that she made the decision to apply for the job because she was inspired by her experience of the voir dire in this case—and this inspiration was specifically directed at the prosecutorial side, since she already aspired to be a prosecutor some day after finding her job in the narcotics unit of the US Attorney's Office to be "overwhelmingly positive." The juror was presumably motivated to think highly of the DA's Office in order to be well-prepared to establish a positive connection with the office in the event she was interviewed. And, a job applicant is by nature partial towards the prospective employer, here the prosecuting office in this case.

Even if the juror was sincerely convinced that she would be a fair juror, it was problematic for her to be one of the triers of fact in an action brought by her prospective employer. Her knowledge that she was seeking a job at the DA's Office, as well as her experience of crafting her argument in her cover letter to the DA's Office that she would be an excellent prosecutor there, created a relationship between her and the DA's office, which raised a high likelihood that she would be inclined

to favor the People, and which was "likely to preclude [her] from rendering an impartial verdict" (CPL 270.20 [1] [c]). As noted, the juror's assertions of impartiality are irrelevant to our analysis, as her implied bias is incurable.

Separately, permitting a juror seeking employment with the prosecuting agency in a criminal matter to serve on the jury creates the appearance of impropriety, and erodes the public's confidence in the criminal justice system. Indeed, a number of cases make clear that a juror's recent contact or association with the prosecuting agency's office warrant a dismissal for cause (*see e.g. People v Lynch*, 95 NY2d 243, 248 [2000] [student intern employed at prosecutor's office should have been dismissed for cause]; *People v Greenfield*, 112 AD3d 1226, 1229 [3d Dept 2013] [prospective juror's current cooperation with prosecuting agency required dismissal for cause]).

Further, it is understandable that defense counsel, not knowing of the job application, decided not to challenge the juror, who had made a convincing argument for her ability to be impartial, describing her professional interactions with cooperating witnesses in criminal cases as relevant to her ability to fairly consider witnesses with troubled backgrounds in this case, and who practiced white-collar criminal defense at around that time. Yet, counsel credibly testified that if he had known of the juror's pending job application to the DA's Office, he would have challenged her on that basis. A for-cause challenge should have been granted if the juror had disclosed the information, due to her conflict of interest as a juror who was in the process of vying for a job as an ADA at the same office prosecuting defendant in this case.

In sum, the court should have granted defendant's motion to vacate his conviction, since "[i]mproper and prejudicial conduct not appearing in the record occurred during a trial resulting in the judgment," which "would have required a reversal of the judgment upon an appeal therefrom" if it had occurred on the record (CPL 440.10 [1] [f]).

Finally, the verdict was not against the weight of the evidence, and there is thus no basis for dismissal of the indictment or reduction of the conviction. Since we are reversing the order and judgment, and granting the motion to vacate, we do not reach defendant's remaining arguments.

Accordingly, the judgment of the Supreme Court, New York County (Daniel P. Conviser, J.), rendered May 22, 2014, convicting defendant, after a jury trial, of murder in the second degree,

and sentencing him, to a term of 23 years to life, and the order of the same court and Justice, entered on or about June 28, 2016, which denied his CPL 440.10 motion to vacate the judgment, should be reversed, on the law, the motion to vacate granted, and the matter remanded for a new trial.

MAZZARELLI, ANDRIAS, OING and SINGH, JJ., concur.

Judgment, Supreme Court, New York County, rendered May 22, 2014, and order, same court and Justice, entered on or about June 28, 2016, reversed, on the law, the motion to vacate granted, and the matter remanded for a new trial.