IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee*,

*v.*

DIMITRI POLANCO ROMERO,
*Appellant*.

No. 2 CA-CR 2023-0010
Filed August 13, 2024

---

Appeal from the Superior Court in Pima County
No. CR20203538001
The Honorable Catherine M. Woods, Judge

**AFFIRMED**

---

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Mariette S. Ambri, Assistant Attorney General, Tucson
*Counsel for Appellee*

Megan Page, Pima County Public Defender
By David J. Euchner, Assistant Public Defender, Tucson
*Counsel for Appellant*

**OPINION**

Chief Judge Staring authored the opinion of the Court, in which Judge O'Neil concurred in part and from which Judge Sklar dissented.

S T A R I N G, Chief Judge:

**¶1**      Dimitri Romero appeals from his convictions and sentences for first-degree murder, unlawful discharge of a firearm, fleeing from law enforcement, and possession of a narcotic drug. Romero contends the trial court erred in failing to remove a juror who was not qualified to serve and in denying his motion to sever the narcotics possession charge. He also argues he was denied a fair trial due to cumulative prosecutorial error. For the reasons that follow, we affirm Romero's convictions and sentences.

### Factual and Procedural Background

**¶2**      We view the facts in the light most favorable to sustaining the jury's verdicts and resolve all reasonable inferences against Romero. *State v. Fierro*, 254 Ariz. 35, ¶ 2 (2022). In September 2020, an altercation involving several people occurred in the parking lot of a nightclub. Gunfire erupted, and S.H. suffered multiple gunshot wounds. A Pima County Sheriff's Deputy heard the gunfire and responded. As the deputy approached the scene, he saw Romero's car leaving the nightclub's parking lot, committing multiple traffic violations. The deputy also saw Romero inside the car holding something black. Believing it was a gun, the deputy attempted a traffic stop. Romero did not stop, however, and the deputy pursued him for more than four miles. The pursuit ended when Romero's car struck a fence. Deputies found a black handgun on the floorboard of Romero's car, and a search of his person revealed a plastic bag containing cocaine.

**¶3**      Tucson Police Department (TPD) Detective Brumitt, the lead detective, arrived at the nightclub after the shooting and was briefed by other officers about the traffic stop and the gun found in Romero's car. By that time, Romero had already been taken into custody, and the shooting victim, S.H., had been dropped off by one or more unknown persons at a local hospital. S.H. died as a result of his wounds.

**¶4**      Detectives obtained surveillance footage of the parking lot and nightclub exit. The videos of the parking lot were grainy. In the videos,

Romero and S.H. are seen standing in the busy parking lot after leaving the nightclub. S.H. walks towards his car, and Romero follows him and shoots in his direction multiple times before leaving. Around the same time, other individuals begin to shoot guns up into the air, performing an "airing out" of the area to prompt people to leave.

¶5　　　　Detectives later identified the car that had taken S.H. to the hospital. The car had been struck by multiple gunshots.

¶6　　　　Based on the surveillance footage, detectives determined approximately where in the parking lot S.H. had been shot—and from where the shots had been fired—and focused on that area. In that area, they discovered four nine-millimeter shell casings, all from the same manufacturer.[1]

¶7　　　　Romero's gun was test fired, and, using the National Integrated Ballistic Information Network (NIBIN), the casing generated from that test firing was then compared to one of the four casings described above. They matched. Romero was subsequently charged with first-degree murder, possession of a narcotic drug, unlawful discharge of a firearm, and fleeing from law enforcement.[2]

¶8　　　　After a four-day jury trial, Romero was convicted on all four counts. The trial court sentenced him to concurrent terms of imprisonment, the longest of which is life in prison without the possibility of release for at least twenty-five years.[3] This appeal followed. We have jurisdiction pursuant to article VI, § 9 of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

---

[1]None of the bullets that struck S.H. were ever recovered.

[2]Romero was also charged with possession of a deadly weapon by a prohibited possessor, but this charge was severed before trial on Romero's motion.

[3]The state subsequently moved to modify Romero's sentence for first-degree murder, asserting that, under A.R.S. § 13-752(A), "the only sentence available" is a sentence of "natural life," that is, life in prison without the possibility of release. *See* A.R.S. § 13-1105. Absent an appeal or cross-appeal by the state, we lack jurisdiction to correct an erroneously lenient sentence. *See State v. Dawson*, 164 Ariz. 278, 281-82 (1990).

## Discussion

### I. Failure to Strike Juror for Cause

**¶9**        For the first time on appeal, Romero argues the trial court erred by failing to remove a juror "who was not qualified to serve under A.R.S. § 21-211 and *State v. Eddington*, 228 Ariz. 361 (2011)."[4]  "[E]xcusing jurors is committed to the sound discretion of the trial court" and we will not set aside a court's decision as to whether to strike a juror for cause "absent clear and prejudicial abuse of that discretion."  *State v. Milke*, 177 Ariz. 118, 122 (1993); *see State v. Colorado*, 256 Ariz. 97, ¶ 23 (App. 2023).

**¶10**        A criminal defendant has a constitutional right to be tried by an impartial jury.  U.S. Const. amend. VI; Ariz. Const. art. II, § 24.  A trial court "must excuse a prospective juror . . . from service . . . if there is a reasonable ground to believe that the juror . . . cannot render a fair and impartial verdict."  Ariz. R. Crim. P. 18.4(b).  The party challenging empanelment of the juror bears the burden of establishing that the juror is "incapable of rendering a fair and impartial verdict."  *State v. Acuna Valenzuela*, 245 Ariz. 197, ¶ 21 (2018) (quoting *State v. Lavers*, 168 Ariz. 376, 390 (1991)).  And, as we discussed in *State v. Jimenez*, 255 Ariz. 550, ¶¶ 6-8

---

[4]Generally, when a defendant does not object in the trial court, he has waived review for all but fundamental error.  *State v. Escalante*, 245 Ariz. 135, ¶ 12 (2018).  In *State v. Escalante-Orozco*, our supreme court concluded that when a defendant had not objected to the seating of a juror, fundamental error review applied.  241 Ariz. 254, ¶ 40 (2017).  But in later clarifying how courts should apply the fundamental error review standard, the court abrogated the paragraph of *Escalante-Orozco* discussing that standard.  *Escalante*, 245 Ariz. 135, ¶ 15.  Although the court's discussion in *Escalante* does not cast into doubt the conclusion that fundamental error applies in this context, it is unclear whether Romero is required to establish he was prejudiced by the trial court's purported error in failing to sua sponte remove the juror.  *See id.* ¶ 21.  Romero, however, contends that "[b]ecause peremptory challenges have been eliminated in Arizona, [a] defendant has no way to rectify a trial court's error in failing to disqualify a biased juror."  Thus, he asserts "structural error is present and [his] convictions must be reversed."  Because we conclude the court did not err in failing to sua sponte strike the juror, we need not address either the application of fundamental error in this context or Romero's argument regarding structural error.  *See State v. Soliz*, 223 Ariz. 116, ¶ 12 (2009) ("The prerequisite to [structural] error is that error indeed occurred.").

& 6 (App. 2023), Arizona's elimination of peremptory strikes in criminal trials delegates to our trial courts the responsibility to "exclusively determine the final composition of juries in criminal cases." Further, because a defendant's right to a fair and impartial jury is integral to the public's confidence in the judicial system, under certain circumstances, "[t]he potential for an appearance of bias suffice[s] to require disqualification regardless of any juror-specific finding of actual bias." *Id.* ¶ 7 (alterations in *Jimenez*) (quoting *Eddington*, 228 Ariz. 361, ¶ 10).

**¶11** A potential juror is disqualified for cause when they are "interested directly or indirectly in the matter under investigation" or "biased or prejudiced in favor of or against either of the parties." § 21-211(2), (4); *see Eddington*, 228 Ariz. 361, ¶ 7. A person "interested directly or indirectly" in the case includes those with "a desire to see one side prevail in litigation or an alignment with or loyalty to one party or side." *Eddington*, 228 Ariz. 361, ¶¶ 1, 11. A peace officer who is "currently employed by the same agency, office, or department that conducted the investigation in a criminal case" is an interested person who must be struck for cause. *State v. Eddington*, 226 Ariz. 72, ¶ 8 (App. 2010).

**¶12** During voir dire, the juror was asked whether he had "any background or experience in law enforcement, law, or medicine." The juror replied that he had gone "to school for criminal justice . . . 20 years ago." The juror also volunteered that he "had an interview and got placed on the civil service ranking list" and "possibly within the next six months . . . might be working for TPD" as "a civilian in evidence." When questioned, the juror confirmed he did not know any of the witnesses, other jurors, or facts in Romero's case, could remain impartial, and would "honor[] . . . Romero's constitutional protections." Neither party followed up with additional questions for the juror, and he was subsequently empaneled without objection.

**¶13** For the first time on appeal, Romero argues the juror should have been disqualified. Romero admits that "[n]o Arizona case discusses the application of A.R.S. § 21-211(2) to prospective employees" and that the juror "was not yet employed with TPD." He contends "the psychological pressures of pleasing a prospective employer are arguably greater than those of pleasing a current employer," thereby making the juror an interested party subject to disqualification.

**¶14** We disagree that Romero has shown reasonable grounds for the juror's exclusion. *See* Ariz. R. Crim. P. 18.4(b). Although a law enforcement officer may be disqualified as an interested person based on

"his working relationship with his law enforcement employer, and by extension, the prosecution" involved in the case, *State v. Johnson*, 247 Ariz. 166, ¶ 125 (2019), the juror in question had no such relationship. The speculative prospect of potential employment is distinctly attenuated from the circumstances in *Eddington*. *Cf. Eddington*, 228 Ariz. 361, ¶¶ 2, 18 (deputy sheriff currently employed by agency that investigated murder of police officer's son and familiar with trial court's security procedures disqualified). *But see People v. Southall*, 65 N.Y.S.3d 508, 515-18 (N.Y. App. Div. 2017) (implied bias warranted new trial where juror failed to disclose job application to work for office prosecuting the case). The trial court did not abuse its discretion in failing to strike the juror. *See Milke*, 177 Ariz. at 122.

## II. Severance

¶15 Romero challenges the trial court's denial of his motion to sever the narcotics possession charge from the other counts of the indictment. We generally review a court's ruling on a motion to sever for an abuse of discretion. *State v. Allen*, 253 Ariz. 306, ¶ 50 (2022). Here, because Romero did not renew his motion during trial, we review only for fundamental error. *See id.*; Ariz. R. Crim. P. 13.4(c). "Under fundamental error review, the defendant bears the burden to establish that (1) error exists, (2) the error is fundamental, and (3) the error caused him prejudice." *State v. Riley*, 248 Ariz. 154, ¶ 24 (2020). We read the joinder and severance rules together to determine whether the court erred. *See State v. Kinkade*, 140 Ariz. 91, 93 (1984).

¶16 Two or more offenses may be joined in an indictment if they "(1) are of the same or similar character; (2) are based on the same conduct or are otherwise connected together in their commission; or (3) are alleged to have been a part of a common scheme or plan." Ariz. R. Crim. P. 13.3(a). "[I]n the interest of judicial economy, joint trials are the rule rather than the exception." *State v. Murray*, 184 Ariz. 9, 25 (1995). However, in general, a court must order counts to be severed "if necessary to promote a fair determination of any defendant's guilt or innocence." Ariz. R. Crim. P. 13.4(a). Trial courts have broad discretion to deny severance absent a showing of compelling and unavoidable prejudice. *Allen*, 253 Ariz. 306, ¶ 55; *State v. Grannis*, 183 Ariz. 52, 58 (1995), *disapproved of on other grounds by State v. King*, 225 Ariz. 87, ¶ 9 (2010).

¶17 The week before trial, Romero moved to sever the counts of the indictment charging him with misconduct involving weapons and

possession of a narcotic drug.[5]  He asserted the "drug charge [wa]s not associated with the homicide charge" and was "completely separate." After noting Romero had failed to file a written motion for severance before the expiration of the pretrial motion deadline, the trial court asked the state whether evidence supporting the narcotics possession overlapped with evidence supporting the other charges.  The state argued the evidence was overlapping, explaining that Romero had fled from law enforcement officers after leaving the scene of a homicide.  The state continued that once Romero had been apprehended, officers "locate[d] the weapon and the drugs in the vehicle that he was fleeing in" and Romero "was the sole occupant of that vehicle."  In summarizing its position, the state asserted it was agreeing to severance of the gun charge but objecting to severance of the drug charge.  Defense counsel responded, "That's fine, Your Honor. That's fine with us."  The court granted Romero's motion as to the misconduct involving weapons charge but noted that the other charges, including narcotics possession, would proceed to trial as scheduled.

**¶18**        On appeal, Romero argues he was entitled to severance of the narcotics possession charge as a matter of right pursuant to Rule 13.4(b). Under this rule, if offenses are "joined solely" under Rule 13.3(a)(1), a defendant is entitled to severance of the charges—as a matter of right— before the case goes to the jury "unless evidence of the other offense . . . would be admissible if the offenses were tried separately."  He asserts the state "offered no information that would suggest that evidence of drug possession would be relevant in the murder trial or vice versa" at the time of his motion and made "no attempt to show that the cocaine related to the murder charge" at trial.

**¶19**        Contrary to Romero's apparent suggestion that the narcotics possession charge was joined with the other offenses based solely on its similarity to those offenses under Rule 13.3(a)(1), joinder of the offenses was proper under Rule 13.3(a)(2).  Indeed, the narcotics possession charge was "based on the same conduct" or was "otherwise connected together in [its] commission" with the flight, discharge of a firearm, and murder charges. Ariz. R. Crim. P. 13.3(a)(2); *see State v. Prince*, 204 Ariz. 156, ¶¶ 14-15, 17 (2003) (charges properly joined under Rule 13.3(a)(2) "where separate

---

[5]Although Romero's oral motion to sever was untimely, the trial court does not appear to have rejected it on that basis.  *See* Ariz. R. Crim. P. 13.4(c) (defendant must "move to sever at least 20 days before trial or as the court otherwise orders").

crimes arise out of a series of connected acts, provable by much of the same evidence"); *see also State v. Martinez-Villareal*, 145 Ariz. 441, 446 (1985) (burglary in which defendant stole guns was correctly joined with later homicide charges under Rule 13.3(a)(2)). Romero does not argue otherwise. Thus, he was not entitled to severance as a matter of right. *See* Ariz. R. Crim. P. 13.4(b).

**¶20** Accordingly, to establish error, Romero is required to show that, at the time he moved to sever, "he had proved that his defense would be prejudiced absent severance." *Murray*, 184 Ariz. at 25; *see State v. Roper*, 140 Ariz. 459, 461 (App. 1984) (defendant must demonstrate "clear abuse of discretion with respect to the trial court's decision to join offenses, based on a showing at the time the motion is made and not what ultimately transpires at trial"). In moving to sever the narcotics possession charge, Romero did not assert, let alone establish, that his defense would be prejudiced absent severance. On this record, the trial court did not err in denying Romero's motion.

### III. Prosecutorial Error

**¶21** On appeal, Romero argues cumulative prosecutorial error deprived him of a fair trial.[6] To entitle a defendant to relief, the prosecutor's conduct must "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Murray*, 250 Ariz. 543, ¶ 13 (2021) (quoting *State v. Morris*, 215 Ariz. 324, ¶ 46 (2007)). This standard applies to both individual and cumulative claims of prosecutorial error or misconduct. *See id.*; *State v. Robinson*, 253 Ariz. 121, ¶ 64 (2022).

---

[6]Both "'prosecutorial misconduct' [and prosecutorial error] broadly encompass[] any conduct that infringes a defendant's constitutional rights." *In re Martinez*, 248 Ariz. 458, ¶ 45 (2020). Our supreme court has noted "prosecutorial error" may not necessarily "imply a concurrent ethical rules violation," whereas "prosecutorial misconduct" may "suggest an ethical violation." *Id.* ¶ 47. Although the term "prosecutorial misconduct" includes conduct "ranging from inadvertent error or innocent mistake to intentional misconduct," *id.*, such a characterization "makes no difference to our ultimate decision," *State v. Murray*, 250 Ariz. 543, ¶ 12 (2021). "[A]ny finding of error or misconduct may entitle a defendant to relief, but courts should not conflate that inquiry with the collateral issue of a prosecutor's ethical culpability." *Martinez*, 248 Ariz. 458, ¶ 47.

**¶22** For cumulative prosecutorial error, Romero need not show that each alleged instance of error deprived him of a fair trial but instead may show that multiple instances of error "cumulatively amount to fundamental error." *State v. Vargas*, 249 Ariz. 186, ¶ 1 (2020). We first consider each instance of alleged error and then "consider the cumulative effect on the fairness of [Romero]'s trial." *State v. Vargas*, 251 Ariz. 157, ¶ 9 (App. 2021). Because a successful claim of cumulative prosecutorial error necessarily establishes the unfairness of a trial, Romero need not separately assert prejudice. *See Vargas*, 249 Ariz. 186, ¶ 13.

**¶23** Romero did not object at trial on the basis of prosecutorial error. Thus, he must: "1) assert cumulative error exists; 2) cite to the record where the alleged instances of [error] occurred; 3) cite to legal authority establishing that the alleged instances constitute prosecutorial [error]; and 4) set forth the reasons why the cumulative [error] denied [him] a fair trial with citation to applicable legal authority." *Id.* ¶ 14.

**¶24** Romero argues the prosecutor "repeatedly committed four types of error." We review each category of alleged error below. *See Vargas*, 251 Ariz. 157, ¶ 9. Notably, at oral argument in this court, Romero conceded that no single act of prosecutorial error was sufficient to justify reversal.[7]

### A. Improper opinion testimony

**¶25** Romero argues the prosecutor repeatedly elicited improper opinion testimony from witnesses identifying him and S.H. in the surveillance footage. Romero also asserts the prosecutor elicited improper NIBIN opinion testimony regarding the shell casings found at the scene.

### 1. Video evidence

**¶26** Romero argues the prosecutor committed error by eliciting testimony from police officers during trial "that [he] was the shooter" despite being "unacquainted with [him]," which essentially amounted to "testi[mony] that [he] was guilty." He argues such testimony was improper

---

[7]Romero also claims "[t]he prosecutor's opening statement was loaded with improper argument." Because he does not meaningfully develop this argument, we do not address it. *See State v. Bolton*, 182 Ariz. 290, 298 (1995) ("Failure to argue a claim on appeal constitutes waiver of that claim.").

because Rule 704, Ariz. R. Evid., prohibits witnesses "from offering an opinion that essentially tells the jury how to decide the case." Romero asserts this prohibition "extends to witnesses telling jurors what may be seen in a photograph or video, unless the witness describes specific traits about something in the video that the jury would not otherwise know, in which case Rule 701[, Ariz. R. Evid.,] may permit a lay opinion."

¶27 Before trial, the state moved to admit into evidence surveillance video of the incident. The state noted it had "combined portions of the video evidence in order to admit it at trial." It also "digitally inserted" colored arrows and a red circle "in the video to note where certain people are while the video is playing" but asserted it had not "fundamentally alter[ed] the video or impact[ed] the objectiveness of the evidence." The state explained it intended to use the identifiers during trial "to help the jury understand who is who and what is what from a testimony point of view with the lead detective." Romero objected, arguing the video was not the "best evidence" and was "an artificial creation produced by the State from several clips of various video cameras in the parking lot at the scene of the crime." He also asserted that if the video were presented to the jury, Rule 106, Ariz. R. Evid., would allow him to present additional surveillance footage from various cameras in the parking lot.

¶28 The trial court granted the state's motion, concluding the video "present[ed] relevant information on the issue of whether defendant was the person who fired or did not fire a gun." *See* Ariz. R. Evid. 401. The court further observed "the green, red, and yellow arrows and the red circle appear[] to have the purpose of focusing the jury's attention on certain relevant events." It stated this was the "substantial equivalent of someone being allowed to use a pointer to point on an exhibit." The court also concluded the video's relevance was "not substantially outweighed by the danger of unfair prejudice." *See* Ariz. R. Evid. 403.

¶29 During his direct examination of Detective Brumitt, the prosecutor presented the surveillance footage including the added arrows and circle. The prosecutor pointed out a person in the footage wearing a "[w]hite shirt" and "dark pants" and asked Brumitt, "Who is that individual?" Brumitt responded, "It's Mr. Romero." Brumitt proceeded to describe the area covered in the footage as "one of the main rows in the parking lot for vehicles to park" before singling out a vehicle "with the brake lights on" and stating it was believed to be S.H.'s rental vehicle.

¶30 The prosecutor subsequently asked Brumitt to describe the significance of the red arrow in the footage. He replied, "[B]ased on

review[] of the entire video and knowing the chain of events, that's Mr. Romero fighting with—or arguing and pushing with an associate of his he's seen interacting with earlier in the video." Brumitt continued to describe events in the footage to the jury, explaining at one point, "That's [S.H.] walking back towards the vehicle" and confirming once again that the vehicle "belonged to the victim." When another view of the parking lot was shown, Brumitt again identified Romero and S.H. and described their movements and actions to the jury. At one point, Brumitt described that Romero was heading eastbound and, in response, the prosecutor asked, "So the arrow was following the guy who just fired shots; right?" Brumitt responded, "Yes, sir." Brumitt continued to identify Romero and the victim on the video throughout his testimony.

¶31 Romero first argues the trial court erred in allowing the prosecutor to introduce "copies of the videos that include colored arrows depicting what the State believes are in the videos," apparently suggesting the prosecutor committed error by eliciting and relying on the modified video evidence during trial. The state asserts the footage introduced by the prosecutor only "identif[ied] Romero and the victim at certain points . . . amidst the other activity in the parking lot." It asserts the footage "did not answer the ultimate question for the jury in the case—whether Romero caused the death of [S.H.] and whether he intended or knew that he would cause the death of [S.H.] and acted with premeditation."

¶32 "Diagrams are widely accepted to illustrate other evidence and to assist the jury in understanding testimony." *State v. Doerr*, 193 Ariz. 56, ¶ 47 (1998). The admission of a diagram is within the sound discretion of the trial court. *Id.* We apply the same standard to the markings on the footage in this case, and we agree with the trial court's determination that the markings on the footage were similar to "someone being allowed to use a pointer." Additionally, when granting the state's request to introduce its video evidence, the court told Romero he could introduce additional footage under the rule of completeness, in accordance with Rule 106. Admission of the footage with the markings was not improper; the prosecutor did not err by introducing it.

¶33 Romero also argues the prosecutor elicited improper opinion testimony from Brumitt concerning the locations of Romero and S.H. in the footage of the parking lot in violation of Rule 704, which prohibits expert witnesses from "stat[ing] an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Additionally, he asserts "the State made no

showing that the detectives' testimony met the standard for lay opinion testimony" set forth in *State v. King*, 180 Ariz. 268 (1994). The footage, Romero asserts, was "the only evidence connecting [him] to the killing," aside from four shell casings found in the parking lot. Romero contends the prosecutor's ability to obtain a conviction "hinged on the jury's belief that [he] was the person in a white tee-shirt and dark pants associated with the muzzle flashes." The state contends Brumitt's testimony regarding the video evidence was proper because his "identifications were based on his perception and his extensive familiarity with the content of the . . . videos."

¶34        To the extent Romero asserts Brumitt was testifying as an expert, we disagree. For non-expert witnesses, Rule 701 provides that "testimony in the form of an opinion is limited to one that is: (1) rationally based on the witness's perception; (2) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702," Ariz. R. Evid. When a lay witness draws a reasonable inference from his "firsthand knowledge and perceptions of a situation," the testimony is admissible, *State v. Ayala*, 178 Ariz. 385, 388 (App. 1994), even if it goes towards an ultimate issue, so long as it meets the other requirements of Rule 701, *Doerr*, 193 Ariz. 56, ¶ 26. Nevertheless, "opinion evidence is usually not permitted on how the jury should decide the case." *Fuenning v. Superior Court*, 139 Ariz. 590, *supp. op.*, 139 Ariz. 603, 605 (1983).

¶35        Here, even assuming Brumitt's testimony concerning the identity of the person depicted in the video amounted to inadmissible opinion testimony,[8] we reject Romero's argument. His overarching argument on appeal is prosecutorial error, not that the trial court erred in permitting the challenged testimony. Not every trial error amounts to prosecutorial error merely because it involves evidence presented by a prosecutor. *See Murray*, 250 Ariz. 543, ¶ 13. Romero fails to cite any pertinent legal authority establishing that eliciting the testimony in question, even if improper, constitutes prosecutorial error. *See Vargas*, 249 Ariz. 186, ¶¶ 14-15 (defendant bears burden of persuasion to show prosecutorial error occurred for each allegation and must cite legal

---

[8]Even assuming without deciding Brumitt could have rationally perceived Romero was the individual shown in the video firing a handgun at S.H., Brumitt's testimony added nothing to the jury's understanding of the footage that they could not have deduced themselves from watching it and listening to the testimony of other witnesses.

authority establishing alleged errors constitute *prosecutorial* error); Ariz. R. Crim. P. 31.10(a)(7)(A) (opening brief must contain "contentions with supporting reasons" and "citations of legal authorities" relied upon). As such, his argument fails.

## 2. Improper NIBIN testimony

**¶36** Romero argues the prosecutor knowingly committed error by eliciting "NIBIN evidence through nonexpert detectives." Romero relies on *State v. Cisco*, No. 2 CA-CR 2019-0065 (Ariz. App. Mar. 9, 2020) (mem. decision), an unpublished and therefore non-precedential decision, and cites multiple instances in which the state elicited testimony here that NIBIN had shown a "match" or "correlation" between shell casings found in the parking lot of the nightclub and shell casings expended during a test fire of Romero's gun. In *Cisco*, we determined using NIBIN to reach the "*conclusion that the shell casings matched the gun . . . requires scientific, technical, or other specialized knowledge and therefore required* assurances that it was reliable." *Id.* ¶ 11 (emphasis added). Here, Romero claims *Cisco* is not only instructive on this specific issue but establishes the prosecutor in this case "should have been aware that nonexpert police officers cannot testify about NIBIN's accuracy" because he was also the prosecutor in *Cisco*. Romero asserts that "[t]o the extent [the prosecutor] was not aware, it amounts to deliberate ignorance."

**¶37** At trial, the prosecutor—by way of a leading question—asked Detective Brumitt whether the gun found in Romero's car had been "NIBIN compared" against shell casings collected from the parking lot of the nightclub and whether there had been "enough information to say that there was a match." Brumitt responded affirmatively. The prosecutor again asked Brumitt about the NIBIN match in the following exchange:

> Q   Ultimately after the NIBIN connection, which is the ballistics connection between the shell casings that you've described as matching each other—
>
> A   Yes, sir.
>
> Q   —on the gun and on the scene, NIBIN also supported that; is that correct?
>
> A   Yes, sir.

¶38        The prosecutor also asked TPD Detective Simmons—another detective assigned to the investigation—whether evidence in this case had been submitted to NIBIN. Simmons testified he had submitted one "nine millimeter . . . Winchester branded cartridge case[]" collected from the parking lot of the nightclub for NIBIN analysis. The prosecutor also asked Simmons whether he "remember[ed] any of the results from that," and the detective responded that he "believe[d] there was a correlation for the nine millimeter case," indicating "an investigative lead . . . that there was an item that was put into NIBIN [that] matched another item." The prosecutor again asked the detective whether NIBIN had shown a "correlation" between the shell casings collected in the parking lot and the test-fired casing from Romero's gun, and the detective confirmed that it had. On redirect, the prosecutor once again asked Simmons—in leading fashion— "You also are aware that the gun that was used in those four shell casings shooting was a match?" The detective responded, "Yes."

¶39        Only one of the state's witnesses, TPD Criminalist Dittemore, was qualified to testify as a ballistics expert during trial.[9] The prosecutor did not ask Dittemore any questions related to NIBIN matching, and Dittemore testified only as to her own comparison analysis and her conclusion that the four cartridge cases had all been fired from the gun found in Romero's car.

¶40        Under Rule 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if (1) the expert's knowledge will help the trier of fact understand the evidence or determine a fact in issue; (2) the testimony is "based on sufficient facts or data"; (3) the testimony is the "product of reliable principles and methods"; and (4) the expert has reliably applied the principles and methods to the facts of the case. Trial courts "should serve as gatekeepers in assuring that proposed expert testimony is reliable and thus helpful to the jury's determination of facts at issue." Ariz. R. Evid. 702 cmt. to 2012 amend. Here, Romero argues, and the state concedes, that a detective may not testify on ballistics matching unless he

---

[9]The state asserts on appeal that Simmons was "a TPD detective specializing in guns," however, it does not clarify what that means nor argue that he is a ballistics expert. Simmons merely testified that, at the time of the shooting, he was assigned to the Gun Crime Reduction Unit, which does not necessarily equate to expertise in the forensic analysis of firearms and ammunition.

or she is first qualified as an expert. *See Cisco*, No. 2 CA-CR 2019-0065, ¶¶ 10-11; *State v. Romero*, 236 Ariz. 451, ¶¶ 11-16 (App. 2014), *vacated in part on other grounds*, 239 Ariz. 6, ¶ 31 (2016) (firearms identification evidence admissible through expert testimony under Rule 702).

**¶41**      The state, however, argues "Romero has not met his burden of showing that the prosecutor violated the holding of *Cisco*" because the prosecutor "did not mislead the jury into believing that the NIBIN results were definitive." It contends that, "unlike in *Cisco*," the word "match" was used "in a context in which the jury would know that the NIBIN results were not definitive," and the prosecutor's opening statement informed the jury that confirmatory and other testing is done "in the laboratory setting, because the NIBIN is [a] kind of a database." (Alteration in answering brief.) And, the state argues, the prosecutor "indicated that an 'absolute' match must be determined by the TPD ballistics expert."

**¶42**      Detectives Brumitt and Simmons were not qualified as ballistics experts at trial. Thus, assuming their testimony amounted to opinions concerning the NIBIN results, as opposed to unobjected-to hearsay about an analysis they did not conduct, it violated Rule 702. *See Cisco*, No. 2 CA-CR 2019-0065, ¶¶ 10-11; *Romero*, 236 Ariz. 451, ¶¶ 11-16. And, even though *Cisco* is an unpublished memorandum decision, the prosecutor in this case was the prosecutor in *Cisco*. Therefore, he knew or reasonably should have known that the introduction of NIBIN testimony through unqualified detectives had been found to be improper; we conclude that his repeated elicitation of such testimony in this case constituted prosecutorial error. *See State v. Dansdill*, 246 Ariz. 593, n.11 (App. 2019) (where appeal had been filed and fully briefed by another criminal defendant challenging similar statements made by the same prosecutor, remarks in later case "may have been a calculated strategy deployed by this prosecutor"); *cf. Pool v. Superior Court*, 139 Ariz. 98, 107 (1984) ("The conduct of the prosecutor was egregiously incorrect to the extent that we must infer that the questions were asked with knowledge that they were improper.").

### B.      Inadmissible hearsay

**¶43**      Romero also argues eliciting "inadmissible hearsay" from Detective Brumitt constituted prosecutorial error. Hearsay is an out-of-court statement offered "in evidence to prove the truth of the matter asserted," Ariz. R. Evid. 801(c), and is inadmissible unless an exception to the rule against hearsay applies, Ariz. R. Evid. 802.

¶44　　　　At trial, the prosecutor informed the court that it planned to call Brumitt as its first witness "to get the primary points across" and to call him again at the conclusion of its case to testify to "final details." The prosecutor stated this would allow the state's witnesses traveling from out of town "to get on the stand today and get some information to the jury." Over Romero's objection to Brumitt providing an initial "superficial presentation" of the case, the court stated it would allow the state to present Brumitt's testimony "in two separate stages or phases conditioned upon there . . . not being avoidable duplication."

¶45　　　　Brumitt subsequently testified, "I was advised that there was an altercation that had happened at [the nightclub]. A large group of males and females were approached and three individuals got into a fight. The fight spread out to various areas within the parking lot." He continued, "[O]fficers had inferred that a male had fired [a gun] several times at" S.H., who "was then transported by an unknown male to [a hospital], and dropped off there." Brumitt testified the license plate on the car that had dropped S.H. off at the hospital "came back to a rental vehicle with a California license plate." Additionally, Brumitt described what he had learned from another officer about the pursuit of Romero and later confirmed Romero had "elud[ed] police, crashe[d] into a fence, [and was] apprehended by police." Finally, Brumitt testified four shell casings found in the parking lot of the nightclub "matche[d] the firearm taken from . . . Romero."

¶46　　　　Romero asserts on appeal that the above testimony constitutes hearsay because it involved information Brumitt had learned from other officers in the course of the investigation, and prosecutors "have a duty to follow the rules of evidence and avoid purposefully eliciting" such testimony. Further, he argues, "'Course of investigation' evidence is not admissible as a hearsay exception because it is offered to prove the truth of the matter." Although he admits that much of the evidence introduced through Brumitt's testimony "was admissible through other means," he argues that by introducing it through Brumitt, "the prosecutor used his witnesses to vouch for others and reinforced their credibility."

¶47　　　　The state asserts the trial court "expressly permitted the prosecutor to use Brumitt's initial testimony to provide a brief overview of the case." Further, relying on *State v. Hernandez*, 170 Ariz. 301, 307 (App. 1991), the state appears to suggest Brumitt's testimony did not constitute hearsay because it merely "showed how events unfolded" and was not offered for its truth. And, "to the extent that Brumitt's testimony included

any hearsay," the state argues it was either "immaterial or followed by a witness with personal experience who testified to the material fact and therefore was not prejudicial."

¶48 However, even assuming Brumitt's testimony was not admissible under any hearsay exception or exclusion, Romero fails to cite pertinent legal authority establishing that elicitation of this testimony constituted *prosecutorial* error—especially in light of the trial court allowing Brumitt to provide summary testimony at the start of the case. *See Vargas*, 249 Ariz. 186, ¶¶ 14-15; Ariz. R. Crim. P. 31.10(a)(7)(A). We therefore reject his claim of prosecutorial error arising from the elicitation of hearsay.

### C. Leading questions

¶49 Romero argues the prosecutor improperly "used leading questions to testify to the jury" and "led most of his witnesses through th[e] trial." He contends that because the witnesses "mere[ly] acquiesce[d] to the prosecutor's assertions," "the jury heard the lion's share of evidence from the mouth of the prosecutor rather than from the State's witnesses." In support of his argument, Romero points to the fact that Detective Brumitt, the lead detective, answered, "Yes, sir," or a variation thereof, in response to the prosecutor's questions more than 100 times during direct and redirect examination. The state counters that, to the extent the prosecutor used leading questions in his examination of Brumitt, those questions were used "simply to move quickly through the general background of the case" before other "individual witnesses . . . testif[ied] to their portion of the investigation." The state argues the trial court has discretion to allow leading questions, especially absent an objection, and in any event, the testimony Romero challenges "was received through proper questioning either earlier or later in the trial."

¶50 Additionally, the state points out Romero has not specified which questions he is challenging as improper and "has not indicated how each question put the *answer* into the mouth of the witness." As such, the state contends, Romero has waived his argument on appeal. Assuming without deciding the state is correct, we may forgo application of the waiver rule "when justice requires." *State v. Clark*, 249 Ariz. 528, ¶ 17 (App. 2020) (quoting *Liristis v. Am. Fam. Mut. Ins. Co.*, 204 Ariz. 140, ¶ 11 (App. 2002)). In our discretion, we address Romero's argument.

¶51 Leading questions are questions that suggest an answer. *State v. Payne*, 233 Ariz. 484, ¶ 119 (2013). "A question is not leading just because the answer is obvious." *State v. Agnew*, 132 Ariz. 567, 577 (App. 1982).

Generally, leading questions "should not be used on direct examination except as necessary to develop the witness's testimony." Ariz. R. Evid. 611(c). Although leading questions are generally prohibited on direct examination, the general prohibition is not absolute, and a trial court may, at its discretion, allow a party to ask leading questions of its own witness. *State v. Duffy*, 124 Ariz. 267, 273-74 (App. 1979); *see Payne*, 233 Ariz. 484, ¶ 119 (leading questions may be permitted where justice requires). In determining whether to allow leading questions, a court should take into consideration "the complexity of the issues and facts," and "whether such questions are foundational in nature" or are "necessary to develop testimony." *Duffy*, 124 Ariz. at 274.

**¶52** Here, Romero did not object to the prosecutor's extensive use of leading questions at any point during trial, and the court never sua sponte prohibited the prosecutor from leading the state's witnesses. Many of the prosecutor's questions asked over the course of the four-day trial were either not leading or could be characterized as foundational or necessary to develop testimony. Nevertheless, we conclude the prosecutor erred several times in asking leading questions that included elements necessary to establishing Romero's guilt. Particularly troubling was the prosecutor's use of leading questions during Brumitt's testimony about the surveillance footage in the following exchange:

> Q    So do you see the video, obviously, in front of you and do you see a subject in that video?
>
> A    Yes, sir.
>
> Q    White shirt, dark pants?
>
> A    Yes, sir.
>
> Q    White shoes?
>
> A    Yes, sir.
>
> Q    Who is that individual?
>
> A    It's Mr. Romero.

**¶53** The prosecutor continued to lead Brumitt through his testimony about the surveillance footage, asking, "What do you see there; muzzle flashes?" Brumitt answered affirmatively. He had not previously testified during trial that he observed "muzzle flashes" in the grainy

footage. And the prosecutor continued to ask leading questions that included information Brumitt had not yet volunteered:

> Q   So the arrow was following the guy who just fired shots; right?
>
> A   Yes, sir.
>
> Q   Where is he going? Did you see anything in his hand?
>
> A   Yes, sir. In his right hand it appears to be an object with—how he would hold a pistol in his right hand.
>
> Q   And you see the same guy, white shirt, dark pants, white shoes, gun in hand?
>
> A   Yes, sir.
>
> Q   About [to] get into a vehicle . . . ?
>
> A   Yes, sir.
>
> Q   So right behind him you see a guy shooting up into the air; correct?
>
> A   Yes, sir.

¶54   On the fourth day of trial, the state again called Brumitt to the stand:

> Q   I want to start with the first. I'm going to go frame by frame on a couple of these. Do you see where the green arrow is denoting an individual?
>
> A   Yes, sir. That's [S.H.], the victim in this case.
>
> Q   And just so we're clear for the record and for the jury, this is the same area we've been discussing throughout the entirety of the trial

with the rental vehicle by [S.H.], that's his vehicle there?

A   Yes, sir.  The headlights and taillights are to the Chevy Impala that was rented to [S.H.]. He's currently on my—I've watched this video many, many times.  This is a series of him walking along the driver's side of the car.  The driver's side is away from the view of the camera.

Q   He's still alongside the Impala?

A   Yes, sir.  He's still on the far side of the vehicle.

Q   Into the frame do you see [a] muzzle flash?

A   Yes, sir, arm extended.

Q   And—

A   Appears to be a muzzle flash to me.

Q   My arrow went away for some reason.

A   Arm is still extended.  Another muzzle flash.

Q   And do you see the victim go down?

A   I—my eyes do see a dark object appear to kind of fall with the series of this.  See the arm extended and the repeated muzzle flashes, yeah.  When it's done in rapid sequence, the fall of that dark object which previously I could identify as matching the clothing description of [S.H.] starts to go down.

Q   He goes down right there.  Do you see it?

A   Yes, sir, I do.

Q     And he is walking away from that suspect;
correct?

A     Yes, sir, he is.

¶55     Additionally, the prosecutor led Brumitt through testimony as to whether there had been a NIBIN match, asking, "So when [TPD] had the weapon retrieved from the vehicle of Mr. Romero, it was NIBIN compared; correct?"  After Brumitt confirmed there had been a NIBIN comparison, the prosecutor asked, "And there was enough information to say that there was a match between some shell casings located at the scene?"  Brumitt again answered affirmatively.

¶56     Further, during the prosecutor's redirect examination of Detective Simmons, the following exchange occurred:

Q     You've got four shell casings that match a
gun; correct?

A     Correct.

Q     You've got a shooting scene that is very
specific, on video the suspect shooting multiple
times at that victim?

A     Yes.

Q     You have a Chevy Impala that ends up at
the hospital 15 minutes later with the
deceased—soon to be deceased victim; correct?

A     Yes.

Q     You follow the video, you see a guy walk
to the car, get in the car with a black object in his
hand; correct?

A     I don't remember that part.

Q     You are aware that [officers] stop[] a car
after a pursuit?

A     Yes.

Q    And that suspect is here in the courtroom today?

A    Yes.

Q    You also are aware that the gun that was used in those four shell casings shooting was a match?

A    Yes.

¶57    Although, as noted, a question is not leading merely because the answer is obvious, *Agnew*, 132 Ariz. at 577, "[w]hat is desired is that the trier hear what the witness perceived, not the acquiescence of the witness in counsel's interpretation of what he perceived," *State v. McKinney*, 185 Ariz. 567, 575 (1996) (alteration in *McKinney*) (quoting Morris K. Udall et al., *Arizona Practice:  Law of Evidence* § 33 (3d ed. 1991)).  It is next to impossible to conceive of any legitimate need for the prosecutor's widespread use of leading questions when examining experienced detectives concerning the substantive aspects and elements of the case.  *Cf. State v. Godsoe*, 107 Ariz. 367, 370-71 (1971) (leading questions permissible where witness is a minor or the subject matter is of a "delicate nature").  Because the record reflects a use of leading questions so pervasive, so unnecessary, and so often employed in a manner that approached the prosecutor's own testimony concerning facts central to Romero's identification, we conclude the prosecutor's conduct constitutes prosecutorial error.

### D.    Burden shifting

¶58    Romero argues that, during "most of [the state's] cross-examinations," the prosecutor "focused on the ability of the Public Defender's Office to do the investigation that police should have done."  In support of his argument, Romero points to the prosecutor's repeated questioning of two defense investigators as to whether they could have—and why they failed to—"visit scenes," "talk to witnesses," "talk to family members," "find girlfriends," or otherwise "find, locate, and serve witnesses and interview them."  Romero argues this line of questioning "incited a juror" to ask, "Why didn't anyone a[t the] Public Defender's Office look for witnesses and interview them if they have the ability?"

¶59    Romero acknowledges that, "[i]n limited circumstances, the prosecution may comment on the defense's failure to present exculpatory

evidence that would substantiate the defendant's theory of the case," and "when defense counsel's closing argument raises an issue for which there is no evidentiary support, the prosecutor may properly rebut that." But Romero contends nothing "allows a prosecutor to elicit testimony and then argue to the jury that the defense should have conducted an investigation to demonstrate innocence."

¶60            "When a prosecutor comments on a defendant's failure to present evidence to support his or her theory of the case, it is neither improper nor shifts the burden of proof to the defendant so long as such comments are not intended to direct the jury's attention to the defendant's failure to testify." *State v. Sarullo*, 219 Ariz. 431, ¶ 24 (App. 2008); *see State ex rel. McDougall v. Corcoran*, 153 Ariz. 157, 160 (1987) ("Even where the defendant does not take the stand, the prosecutor may properly comment on the defendant's failure to present exculpatory evidence which would substantiate defendant's story . . . .").

¶61            Further, comments "invited and prompted by opposing counsel's arguments are not improper if they are reasonable and pertinent." *Acuna Valenzuela*, 245 Ariz. 197, ¶ 88 (quoting *State v. Trostle*, 191 Ariz. 4, 16 (1997)); *see Dansdill*, 246 Ariz. 593, ¶ 44 (prosecutor entitled to rebut defense counsel's arguments about missing evidence and witnesses). These comments, however, should not extend "beyond a fair response to defense statements." *Acuna Valenzuela*, 245 Ariz. 197, ¶ 90.

¶62            Here, defense counsel repeatedly questioned the state's lack of investigation into additional witnesses on the second day of trial and reiterated this failure again on closing. Thus, the state's questioning of the defense investigators on the fourth day of trial was not improper. *See id.* ¶ 88; *Sarullo*, 219 Ariz. 431, ¶ 24 (prosecutor did not shift burden of proof by arguing defendant had failed to call expert witnesses to support his theory); *State v. Lehr*, 201 Ariz. 509, ¶¶ 55-57 (2002) (rejecting defendant's claim that state's question whether experts outside police department could evaluate fingerprints shifted burden to defendant to prove his innocence). No prosecutorial error occurred.

### E.      Cumulative effect

¶63            Our justice system reflects "a rule of law based upon the principle that officers of the law are bound by and must act within the law, even though the necessity of so doing may put them at a disadvantage in dealing with criminals or those accused of crime." *Pool*, 139 Ariz. at 103. A prosecutor's "unique role" in our "system is recognized in ER 3.8, [Ariz. R.

Sup. Ct. 42,] 'Special Responsibilities of a Prosecutor,' which states that '[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate,' and has the duty to 'see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons.'" *In re Martinez*, 248 Ariz. 458, ¶ 8 (2020) (first alteration added, second alteration in *Martinez*).

¶64       Against this backdrop, Romero argues the cumulative effect of the prosecutorial error in this case compels a new trial. Romero has shown prosecutorial error existed, as detailed above, thereby establishing the "first step" in fundamental error review. *Vargas*, 249 Ariz. 186, ¶ 12 (quoting *State v. Escalante*, 245 Ariz. 135, ¶ 21 (2018)). We therefore now consider whether the cumulative error was fundamental. *Id.* Our supreme court has directed that, "[c]onsistent with the third prong of *Escalante*, a defendant claiming cumulative error based on prosecutorial misconduct need not separately assert prejudice," *id.* ¶ 13, because such errors are fundamental when "the error was so egregious that [the defendant] could not possibly have received a fair trial," *id.* ¶ 12 (quoting *Escalante*, 245 Ariz. 135, ¶ 21). In other words, the cumulative error must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Robinson*, 253 Ariz. 121, ¶ 64 (quoting *Payne*, 233 Ariz. 484, ¶ 106); *see also State v. Hughes*, 193 Ariz. 72, ¶ 26 (1998) (reversal requires conduct that "permeates the entire atmosphere of the trial" (quoting *State v. Atwood*, 171 Ariz. 576, 611 (1992))).

¶65       We disagree with Romero that the cumulative effect of the prosecutorial error detailed above "so infected the trial with unfairness" that it amounted to a denial of due process requiring reversal. *Robinson*, 253 Ariz. 121, ¶ 64 (quoting *Payne*, 233 Ariz. 484, ¶ 106). This third prong of the test for fundamental error can include errors that "go[] to the 'foundation of a case' if [they] relieve[] the prosecution of its burden to prove a crime's elements, directly impact[] a key factual dispute, or deprive[] the defendant of constitutionally guaranteed procedures." *Escalante*, 245 Ariz. 135, ¶ 18. It can also encompass errors that "deprive[] the defendant of a constitutional or statutory right necessary to establish a viable defense or rebut the prosecution's case," *id.* ¶ 19, or errors that do all of these things, *id.* ¶ 20. But cumulative error must "so profoundly distort the trial that injustice is obvious without the need to further consider prejudice." *Id.* This is a very demanding standard, which we cannot say Romero met in this case. *Id.* ¶ 31 (appellate relief for fundamental error rare).

¶66        Viewing the facts in the light most favorable to sustaining the jury's verdicts, as we must, *Fierro*, 254 Ariz. 35, ¶ 2, neither the prosecutor's leading questions nor his erroneous use of non-expert testimony had any of the above effects on the trial as a whole. Like in *Cisco*, in which we found prosecutorial error harmless, "ample other ballistics evidence showed that [Romero]'s gun had fired the fatal shots," so that the NIBIN testimony resulting from prosecutorial error was not the only evidence on the point. No. 2 CA-CR 2019-0065, ¶ 17. The record includes video clearly showing Romero standing near the nightclub's exit shortly before the shooting. The video footage of the parking lot, although grainy, establishes where the shooting occurred and shows the shooter—who, at the very least, closely resembles Romero—walking to a point immediately adjacent to Romero's car. It also shows Romero's car leaving the parking lot moments later, and a sheriff's deputy attempting to initiate a traffic stop.

¶67        Dittemore, the only ballistics expert who testified at trial, independently analyzed the shell casings found where the shooting had occurred and concluded they had been fired from Romero's gun, which was found on the floorboard of Romero's car when he was arrested after the pursuit. *See Escalante*, 245 Ariz. 135, ¶ 34 ("amount of error-free evidence" supporting guilty verdict pertinent to "whether, without the error, a reasonable jury could have reached a different result"). Further, the detectives never attempted to explain in detail how NIBIN works, never indicated they had conducted the NIBIN comparison themselves, and never suggested NIBIN was infallible. And the prosecutor never mentioned NIBIN in his closing argument. *See Cisco*, No. 2 CA-CR 2019-0065, ¶¶ 14-17 (prosecutorial error did not affect verdict where ample other evidence properly introduced, including bullet removed from victim's body that matched defendant's gun). In view of this evidence, Romero has not met his burden to show that "injustice is obvious." *Escalante*, 245 Ariz. 135, ¶ 20.

¶68        Finally, our colleague's thoughtful dissent illuminates the lingering murkiness encountered when addressing claims of cumulative prosecutorial error.[10] Perhaps this case provides an opportunity for our

---

[10]The manner in which this case was tried was, at the very least, puzzling. In addition to the actions of the prosecutor, Romero's trial counsel made almost no objections—a fact his appellate counsel noted with visible frustration at oral argument in this court. Further, the trial court never acted sua sponte to address the extensive use of leading questions by the prosecutor. *See Pool*, 139 Ariz. at 104 (trial judge not merely "passive

supreme court to provide further guidance. In any event, the dissent diminishes the demanding nature of obtaining relief for cumulative prosecutorial error. Our colleague's seemingly forgiving analysis is difficult to reconcile with our supreme court's requirement that the cumulative effect of the prosecutorial error "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process" requiring reversal. *Robinson*, 253 Ariz. 121, ¶ 64 (quoting *Payne*, 233 Ariz. 484, ¶ 106).

## Disposition

¶69 For the foregoing reasons, we affirm Romero's convictions and sentences.

O' N E I L, Judge, concurring in part:

¶70 I concur in the result but disagree that any leading questions, without an objection or corrective action by the trial court, were prosecutorial error. I am also unable to criticize the court's decision not to sua sponte intervene in the proceedings to prevent leading questions. I agree with the carefully reasoned opinion in all other respects, concluding that the NIBIN testimony was improper prosecutorial error but not fundamental error.

¶71 I also write separately to address the confusion that is, no doubt, evident from reading both this opinion and our colleague's characteristically thoughtful dissent. We have said before, and in this opinion we have stated again, that not every error in a criminal trial is prosecutorial error. *See State v. Shortman*, 254 Ariz. 338, ¶ 21 (App. 2022); *State v. Aguilar*, 217 Ariz. 235, ¶ 11 (App. 2007). We have offered little guidance, however, to explain the difference. As a result, in the absence of a broader doctrine of cumulative trial error, *see State v. Ellison*, 213 Ariz. 116, ¶ 59 (2006), it seems that we have inadvertently invited every purported error that goes without objection at trial to be clothed on appeal in the often ill-fitting garb of cumulative prosecutorial error.

¶72 As we note, cumulative prosecutorial error sits within the framework of fundamental error review. *See State v. Vargas*, 249 Ariz. 186,

---

observer" and "has an affirmative duty to conduct the trial in such a way as to carry out the goals of the rules" (quoting 1 Morris K. Udall & Joseph M. Livermore, *Arizona Practice: Law of Evidence* § 33, at 51 (2d ed. 1982))).

¶ 14 (2020). As our dissenting colleague also helpfully explains, under that framework, a claim of cumulative prosecutorial error must satisfy the first step of fundamental error review by establishing that prosecutorial error occurred. *See id.* It must then satisfy the second step by showing that the errors cumulatively were of such magnitude that the defendant could not possibly have received a fair trial. *See id.* That showing automatically satisfies the third step, which would otherwise involve a separate showing of prejudice. *See id.* ¶ 13. Thus, a cumulative prosecutorial error claim involves a two-step test. There is confusion at both steps.

**¶73** First, the distinction between prosecutorial error and other kinds of trial error is less than clear. This opinion correctly identifies the basic rule that prosecutorial error "broadly encompasses *any conduct* that infringes a defendant's *constitutional rights*." *State v. Murray*, 250 Ariz. 543, ¶ 12 (2021) (emphasis added in *Murray*) (quoting *In re Martinez*, 248 Ariz. 458, ¶ 45 (2020)). Some errors undermine those rights by their very nature. *E.g.*, *id.* ¶ 19 (prosecutorial error to dilute reasonable-doubt standard). But for cumulative prosecutorial error, which depends on the cumulative effect of individual errors that may not independently implicate any of a defendant's constitutional rights, that rule can be more difficult to apply. *See State v. Hughes*, 193 Ariz. 72, ¶¶ 31, 42-46, 52-53, 59, 70, 74 (1998) (recognizing cumulative prosecutorial error claim may exist where no individual error warrants reversal).

**¶74** Another panel of this court recently opined that prosecutorial error "require[s] the prosecutor to err intentionally knowing it is improper and prejudicial." *Shortman*, 254 Ariz. 338, ¶ 21. That language may overstate the case somewhat, but at least in the context of cumulative prosecutorial error, I think it strikes near the mark. After all, although our supreme court has expressed "the general rule that several non-errors and harmless errors cannot add up to one reversible error," a pattern of pronounced and persistent errors that "permeates the entire atmosphere of the trial" may well speak to a prosecutor's intent to deprive a defendant of a fair trial. *Hughes*, 193 Ariz. 72, ¶¶ 25-26, 31-33. Thus, when a prosecutor's conduct throughout a trial is so pervasively improper that it indicates an "indifference, if not a specific intent, to prejudice the defendant," his cumulative actions amount to prosecutorial error even if no individual act does. *Pool v. Superior Court*, 139 Ariz. 98, 108-09 & 109 (1984). This approach to reviewing prosecutorial error focuses on the nature of the prosecutor's conduct, and it avoids converting cumulative prosecutorial error into a vehicle for asserting what really amount to broader claims of cumulative trial error. *See Ellison*, 213 Ariz. 116, ¶ 59 (rejecting cumulative error

doctrine outside the context of prosecutorial error). As the dissent makes clear, however, this approach appears to stand on uncertain footing because *Martinez* arguably eliminated intent from consideration in claims of prosecutorial error. *See* 248 Ariz. 458, ¶¶ 45-47.

¶75 I do not read *Martinez* that way. I do not think *Martinez* changed the standard for prosecutorial error, whether individual or cumulative. Rather, it cautioned courts against using the word "misconduct," which may suggest ethical culpability, for conduct that might have amounted only to "inadvertent error or innocent mistake." *Id.* ¶¶ 45, 47. In *State v. Robinson*, 253 Ariz. 121, ¶ 68 (2022) (quoting *State v. Lynch*, 238 Ariz. 84, ¶ 6 (2015), *rev'd*, 578 U.S. 613, 616-17 (2016)), our supreme court indicated that "the legal impropriety of [a] prosecutor's questions and actions" cannot "rise[] to the level of prosecutorial error" if performed without "the requisite 'indifference, if not a specific intent, to prejudice'" the defendant. Indifference or intent was relevant to our analysis before *Martinez*, and *Robinson* confirms its continued relevance today. *See State v. Riley*, 248 Ariz. 154, ¶ 158 (2020) (requiring indifference or intent in claim of cumulative prosecutorial misconduct); *Hughes*, 193 Ariz. 72, ¶ 31.

¶76 Second, although we have asserted that the second step of fundamental error review in a cumulative prosecutorial error case is demanding, we have not consistently articulated that standard in a manner that distinguishes it from a typical showing of prejudice. *See State v. Escalante*, 245 Ariz. 135, ¶ 20 (2018) (requiring "egregious" error that "must so profoundly distort the trial that injustice is obvious without the need to further consider prejudice"). My dissenting colleague illustrates the problem when he suggests that the second step may be satisfied with a showing that is "almost identical to the prejudice standard we apply at step three" of our usual fundamental error review.

¶77 According to *Escalante*, 245 Ariz. 135, ¶¶ 20-21 & 20, a separate showing of prejudice is not required if a defendant satisfies step two of fundamental error review by showing that the error was "so egregious that a defendant could not possibly have received a fair trial." With such a showing, a defendant "has shown both fundamental error and prejudice." *Id.* ¶ 21. But for cumulative prosecutorial error, the analysis proposed in the dissent seems simply to replace step two with step three, requiring only prejudice. Thus, although I applaud my colleague's offer of clarity, I cannot join his analysis. A claim of prosecutorial error cannot escape the standards of fundamental error review as set forth in *Escalante*.

To warrant reversal, cumulative prosecutorial error must be both fundamental and prejudicial.

S K L A R, Judge, dissenting:

**¶78**        This case turns on whether Dimitri Romero was the shooter. I agree with the majority that the prosecutor engaged in prosecutorial error relating to this issue.  But I disagree with the majority on two issues, and that disagreement leads me to conclude that a new trial is required.  First, unlike the majority, I believe the prosecutorial error included the elicitation of lay-opinion testimony from Detective Brumitt.  That testimony identified Romero as the shooter based solely on the video footage, which was equally available to the jury.

**¶79**        Second, I believe the majority imposes an improperly high burden upon Romero to demonstrate that the error deprived him of a fair trial.  I do not believe Romero is required to demonstrate a "profound distort[ion of] the trial such that injustice is obvious."  Rather, I believe his burden is to show that the cumulative errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process" and "could have affected" the verdict.

**¶80**        I also believe Romero has satisfied that standard.  Two of the prosecutorial errors—the lay-opinion testimony and leading questions— tilted in the state's favor the central question of whether Romero was the shooter.  These errors were exacerbated by the improper NIBIN testimony. I therefore respectfully dissent.

## I.   Standard of review

**¶81**        We review for fundamental error only, in light of Romero's failure to object at trial, which I agree with the majority was puzzling.  *State v. Escalante*, 245 Ariz. 135, ¶ 12 (2018).  Our general framework for fundamental-error review is set forth in *Escalante*.  *Id.* ¶ 13.  *Escalante*'s three-step framework requires us to determine:  (1) whether error exists; (2) whether the error is fundamental; and (3) whether the defendant has established prejudice.  *Id.* ¶ 21.  At the second step, errors are fundamental if they fit one of three categories, namely, that they:  (1) go to the foundation of the case; (2) take from the defendant a right essential to his defense; or (3) are of such magnitude that the defendant could not possibly have received a fair trial.  *Id.* ¶¶ 16-20.  Errors in the third category do not require a separate prejudice analysis.  *Id.* ¶¶ 20-21.  They automatically require a new trial.  *Id.*

¶82        In *State v. Vargas*, 249 Ariz. 186, ¶ 14 (2020), our supreme court applied *Escalante*'s standard to cumulative-prosecutorial-error cases. In such cases, once prosecutorial error has been established, the defendant need not establish that each individual error was fundamental. *Id.* Nor must the defendant demonstrate that the errors cumulatively fit within one of *Escalante*'s three categories. Instead, *Vargas* automatically classifies cumulative-error claims as fitting within the third category. *Id.* ¶ 13. It thus establishes a two-step analysis, which requires us to determine (1) which conduct constituted prosecutorial error and (2) whether the errors cumulatively denied the defendant a fair trial. *Id.* ¶ 14.

## II.  Conduct that constituted prosecutorial error

¶83        As to which conduct constituted prosecutorial error, I agree with the majority that no such error occurred in connection with: (1) adding arrows to the surveillance videos; (2) Brumitt's hearsay testimony, which was largely background; (3) burden shifting; and (4) the prosecutor's opening statement. My analysis concerns the remaining three assertions of error, namely the (1) lay-opinion testimony that identified Romero as the shooter, (2) leading questions, and (3) NIBIN testimony.

### A.        Improper lay-opinion testimony

¶84        The lay-opinion testimony arose out of the surveillance videos depicting the shooting. I begin with context for the videos and then address why I believe the elicitation of that testimony constituted prosecutorial error.

### 1.  Description of the videos

¶85        Standing alone, the videos are difficult to decipher. Only one video depicts Romero clearly, though it was taken just outside the nightclub and merely shows patrons milling around. Its primary evidentiary value is to show that Romero was wearing a white t-shirt and dark pants.

¶86        Three other videos show the shooting and its aftermath. But as the majority describes, they are "grainy and of poor quality." The first depicts a person wearing similar clothes to Romero's firing a gun several times, then hurrying through the parking lot. The second, taken from further away but with a wider angle, depicts a similar scene. It also shows the shooter moving toward a car, but that portion of the video is so blurry as to be indecipherable. The third video shows a car leaving the parking lot, turning onto the street, and a police car following a few seconds later.

That car had been parked in the same area as the car toward which the shooter ran in the prior video.

### 2. Admissibility of lay-opinion testimony identifying Romero as the shooter

¶87        The prosecutor's elicitation of Brumitt's identification testimony must be viewed against that factual backdrop. Under Rule 701 of the Arizona Rules of Evidence, lay-opinion testimony such as Brumitt's is admissible only if "rationally based on the witness's perception" and "helpful to clearly determining . . . a fact in issue." Ariz. R. Evid. 701(a), (b). Our case law interprets this rule to mean that a lay witness cannot offer opinion testimony identifying a defendant without some independent knowledge. *See, e.g.*, *State v. Miller*, 226 Ariz. 202, n.7 (App. 2010) (concluding that lay-witness testimony about defendant's voice could be admissible under Rule 701 because witness had heard numerous recordings of his voice over a two-month period); *State v. King*, 180 Ariz. 268, 280-81 (1994) (concluding that trial court properly admitted testimony from witnesses who had known defendant at time of crime and could therefore assist jury in identifying person depicted on video). This case law is also consistent with Rule 602 of the Arizona Rules of Evidence, which requires a witness to have personal knowledge.

¶88        Nevertheless, the prosecutor offered the crucial identification testimony through Brumitt:

Q     So do you see the video, obviously, in front of you and do you see a subject in that video?

A     Yes, sir.

Q     White shoes?

A     Yes, sir.

Q     Who is that individual?

A     It's Mr. Romero.

The prosecutor elicited no testimony about the information Brumitt had relied on to reach this conclusion. And unlike in many cases where witnesses narrate videos, the narration here added crucial content that was not evident from the video itself—that Romero was the person who fired

the shots. Nevertheless, the prosecutor repeatedly elicited this testimony from Brumitt.

¶89 Under these circumstances, Brumitt's testimony fails to satisfy Rule 701. The record does not suggest that Brumitt had any independent knowledge of Romero's appearance. Nor have I found cases suggesting that the state may identify the defendant as the perpetrator—let alone repeatedly—without such knowledge. The jury was just as capable as Brumitt of comparing the characteristics of the person in the video to Romero. They saw Romero in the courtroom for the four days of trial. But given the poor quality of the video, it is difficult to see how the jury, or Brumitt, could identify Romero based on the video alone.

### 3. Lay-opinion testimony as prosecutorial error

¶90 Rule 701 provides important context for our analysis, but we are not faced with the question of whether the testimony was inadmissible. We must instead determine whether its elicitation constituted prosecutorial error.

### a. Proper standard for prosecutorial error

¶91 As our colleague's helpful concurring opinion illuminates, it can be difficult to draw the line between evidentiary error and prosecutorial error. Citing our supreme court's decision in *State v. Robinson*, 253 Ariz. 121, ¶ 68 (2022) and this court's decision in *State v. Shortman*, 254 Ariz. 338, ¶ 21 (App. 2022), our concurring colleague would draw that line at conduct that demonstrates an indifference or intent to prejudice Romero's constitutional rights. I understand why he believes this is the proper articulation of the rule, given that it reflects language from two recent cases, including one from our supreme court.

¶92 But I nevertheless conclude that it is the incorrect standard. In a recent case that confronted the prosecutorial-error standard more directly than *Robinson*, our supreme court explained that prosecutorial error does not require intent. In that case, *In re Martinez*, 248 Ariz. 458, ¶ 45 (2020), the court recognized that "prosecutorial misconduct" included "any conduct that infringes a defendant's constitutional rights." Rather than requiring indifference or intent, this definition encompasses "prosecutorial conduct ranging from inadvertent error or innocent mistake to intentional conduct." *Id.*

¶93 *Martinez* did not modify that definition. *Id.* ¶¶ 45-47. It also directed that going forward, courts should describe such conduct as "prosecutorial error" rather than "prosecutorial misconduct" where the conduct "may not necessarily imply a concurrent ethical rules violation." *Id.* ¶ 47 (adopting American Bar Association Recommendation 100B (2010)). Thus, consistent with *Martinez*, I would apply the standard that prosecutorial error is "any conduct that infringes a defendant's constitutional rights." *See also State v. Murray*, 250 Ariz. 543, ¶ 12 (2021) (applying same standard).

¶94 Also, unlike the majority, I believe that Romero has sufficiently developed his prosecutorial-error argument by pointing to the centrality of the improper opinion testimony to Romero's conviction. As I discuss more extensively below, that testimony was so critical that it implicated Romero's due-process right to a fundamentally fair trial. *See State ex rel. Mitchell v. Palmer*, 546 P.3d 101, ¶ 17 (2024) ("Due process requires that a criminal defendant receive a fundamentally fair trial."); *see also State v. Melendez*, 172 Ariz. 68, 71 (1992) ("The touchstone of due process under both the Arizona and federal constitutions is fundamental fairness.").

### b. Application of prosecutorial-error standard

¶95 I likewise believe that Romero has demonstrated prosecutorial error. Under our case law, such error can occur when the prosecutor asks questions that inject improper evidence, including about the witness's or prosecutor's opinion. *Cf. Pool v. Superior Court*, 139 Ariz. 98, 102-03 (1984) ("Suggestion by question or innuendo of unfavorable matter which is not in evidence and . . . for which no proof exists is improper and can constitute misconduct.").

¶96 For example, in *State v. Hughes*, 193 Ariz. 72, ¶¶ 38, 42-46 (1998), our supreme court concluded that a prosecutor had committed misconduct during cross-examination of a defense expert on the insanity defense. The prosecutor repeatedly referred to inadmissible evidence and injected his opinion that the expert had manufactured his conclusions. *Id.* ¶¶ 42-46. The prosecutor also injected improper opinion evidence through police officers to rebut the insanity defense. *Id.* ¶ 47. Those officers had not observed the defendant's past conduct, so they had no basis for comparing his conduct after the crime to his prior conduct. *Id.* Similarly, in *State v. Roque*, 213 Ariz. 193, ¶¶ 157-59 (2006), our supreme court concluded that a prosecutor had committed error by asking a question that inserted her opinion about the validity of a psychiatric test. *See also Pool*, 139 Ariz. at

102-03 (concluding prosecutor had committed misconduct by asking questions that were "irrelevant," "prejudicial," "argumentative," and "designed . . . only to invite speculation").

¶97 Although *Hughes* also involved extensive other misconduct, the instances described above illustrate why I would treat the elicitation of Brumitt's improper identification as prosecutorial error. The key issue in *Hughes* was the insanity defense. *Hughes*, 139 Ariz. 72, ¶ 2. On both cross-examination of the defense expert and redirect of the police officers, the prosecutor's questioning improperly injected his opinion, as well as inadmissible evidence, on that key issue. *Id*. ¶¶ 42-47. The prosecutor did the same here, with the key issue being the shooter's identity. In essence, the improper opinion testimony allowed the jurors to substitute Brumitt's identification for their own analysis. It suggested without foundation that Brumitt may have had information beyond the evidence to reach his conclusion.

### B. Leading questions

¶98 The next category of prosecutorial error is the leading questions. I agree with the majority's assessment that those questions constituted prosecutorial error. They were not directed at hostile witnesses or necessary to "develop the witness's testimony." Ariz. R. Evid. 611(c). Rather, they were directed to experienced detectives on substantive issues. The questions led these witnesses through essential testimony, including a detailed version of the events depicted in the crucial, but grainy, video. As I have noted, testimony that narrates video evidence is often helpful. But in this case, the leading questions simply allowed the prosecutor to tell his version of the events through the officers.

¶99 The leading questions also reinforced the damage done by the improper opinion testimony. The majority highlights Brumitt's initial identification of Romero as one such example. But even more troublesome was the prosecutor's redirect examination of Brumitt. Redirect is a powerful moment because the defense has no immediate opportunity to follow-up. And leading questions are no more permissible on redirect than on initial direct. *See Robinson*, 253 Ariz. 121, ¶¶ 67-68 (stating, in addressing leading questions asked on both direct and redirect, "We do not doubt the legal impropriety of the prosecutor's questions and actions."); *see also* Ariz. R. Evid. 611(c) (generally prohibiting leading questions on direct and not including redirect examination as instance in which court "[o]rdinarily . . . should allow leading questions").

¶100    Nevertheless, at the conclusion of Brumitt's testimony, the prosecutor led him through the following exchange:

> Q    Let me ask it a different way.  How many people were there that were seen shooting at another person walking to their car being stopped by Pima County Sheriff's Department and had a gun that matched shell casings from the killing, how many people did you identify in that scenario?
>
> A    Only one, sir.
>
> Q    Is he in the courtroom today?
>
> A    He is, sir.
>
> Q    Where is he sitting and what's he wearing?
>
> A    He's seated at the defense table in a gray suit jacket, a yellow shirt and tie.
>
> [Prosecutor]  May the record reflect the witness identified the defendant in this case?
>
> The Court    Yes, it will.

This exchange combined improper opinion testimony with leading questions, at a crucial moment of Brumitt's testimony.  It was nothing more than "the acquiescence of the witness in counsel's interpretation of what he perceived."  *State v. McKinney*, 185 Ariz. 567, 575 (1996) (quoting Morris K. Udall et al., *Arizona Practice:  Law of Evidence* § 33 (3d ed. 1991)).  And it improperly allowed the jury to shortcut its essential task of determining whether Romero was the shooter.

### C.    Ballistics evidence

¶101    The third area of prosecutorial error was the ballistics testimony concerning NIBIN.  Here too, I largely agree with the majority.  The prosecutor should not have offered Brumitt and Detective Simmons as witnesses to testify about NIBIN.  They were not qualified as experts.  They therefore had no basis to testify that the weapon retrieved from Romero's car matched shell casings from the scene.  *See* Ariz. R. Evid. 702 (requiring that witness providing scientific, technical, or specialized opinion

testimony be qualified and provide assurance that testimony meets certain standards). The prosecutor should have known that this was an issue based on his participation in *State v. Cisco*, No. 2 CA-CR 2019-0065 (Ariz. App. Mar. 9, 2020) (mem. decision).

**¶102** Although *Cisco* is non-binding, it placed the prosecutor on notice that the testimony he sought to elicit could be improper. But the prosecutor nevertheless engaged in precisely the type of conduct *Cisco* rejects—discussing the "match" between shell casings at the murder scene and the weapon found in Romero's car. He even introduced the concept of a NIBIN "match" with leading questions. Other than a brief introduction to the NIBIN process, the first witness testimony involving NIBIN was the following exchange between the prosecutor and Brumitt:

> Q    So when Tucson [Police Department] had the weapon retrieved from the vehicle of Mr. Romero, it was NIBIN compared; correct?
>
> A    Yes, sir, it was.
>
> Q    And there was enough information to say that there was a match between some shell casings as the scene?
>
> A    Yes, sir.

Later, on redirect of another TPD detective, the prosecutor used leading questions to provide context to NIBIN's function.

> Q    So the gun you have right in front of you that's been admitted into evidence is the gun you test fired for NIBIN purposes?
>
> A    That's correct.
>
> Q    So you get a spent shell from the test fire you have, put that into NIBIN, NIBIN does its magic, compares to the one from the scene that they picked up; correct? I know that's a short summary but is that generally how it works?
>
> A    That's generally speaking but there's a little bit more to it.

Q   I don't want to learn more about NIBIN right at this moment but is that the plan for NIBIN to do its job?

A   Yes.

Q   Okay.   Comparison—the word that everyone's been using, correlation.   There's a correlation between this and this?

A   Correct.

Taken together, this testimony suggested without meaningful explanation or proper foundation that the casings found at the scene matched Romero's gun.

### III. Whether the errors cumulatively denied Romero a fair trial

¶103        Having identified the prosecutorial errors, I turn to the next step of *Vargas*'s analysis—whether the cumulative errors deprived Romero of a fair trial.

### A.        Determining the proper standard

¶104        Much of my disagreement with the majority centers on the proper standard in determining whether Romero received a fair trial.  At the heart of that disagreement is how *Vargas* maps cumulative prosecutorial error onto *Escalante*'s fundamental-error framework.  I agree with the majority that further guidance from our supreme court on this issue would be useful.

¶105        Until that happens, though, we must apply the existing case law.  And as I previously noted, *Vargas* places cumulative prosecutorial error into the third category of fundamental error established by *Escalante*— errors "so egregious that [the defendant] could not possibly have received a fair trial." *Vargas*, 249 Ariz. 186, ¶¶ 12-13 (citing *Escalante*, 245 Ariz. 135, ¶ 21).  From this language, the majority reaches the reasonable—but in my view, incorrect—conclusion that the fair-trial standard applicable here is the same standard set forth by *Escalante* in determining whether an error fits *Escalante*'s third category.  That standard looks to whether the error "so profoundly distort[ed] the trial that injustice is obvious without the need to further consider prejudice." *Escalante*, 245 Ariz. 135, ¶ 20.

¶106 The majority's standard is reasonable because, at least on its face, it appears to faithfully apply *Vargas* and *Escalante*. But I do not believe it actually does. First, nothing in *Vargas* applies this standard to cumulative-error cases. Nor did *Escalante* involve cumulative error. It instead involved the improper, and unobjected-to, admission of drug-courier-profile testimony. *Id.* ¶ 2. More importantly, no post-*Vargas* cases from our supreme court apply the majority's standard in cumulative-error cases. One non-precedential decision from our court did so, though the case involved "egregious and pervasive" prosecutorial errors that satisfied the majority's standard and thus would have satisfied what I believe is the proper standard as well. *State v. Olaoye*, 1 CA-CR 19-0416, ¶ 1 (Ariz. App. Dec. 31, 2020) (mem. decision).

¶107 Our supreme court's cases, by contrast, describe an unfair trial as one in which "the misconduct could have affected the jury's verdict." *Robinson*, 253 Ariz. 121, ¶ 64; *see also State v. Smith*, 250 Ariz. 69, ¶ 138 (2020) (describing standard in fundamental-error case). It also phrases the standard as looking to whether the errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Robinson*, 253 Ariz. 121, ¶ 64 (quoting *State v. Payne*, 233 Ariz. 484, ¶ 106 (2013)). In light of those cases' language, that is the standard I would apply here.

¶108 Aside from fidelity to our supreme court's case law, there is a practical reason for applying this standard over the majority's. The "could have affected" standard is almost identical to the prejudice standard we apply at step three of *Escalante*'s framework in cases involving a single instance of prosecutorial error. Under that standard, recently articulated in *Murray*, a defendant demonstrates prejudice by showing that, "without the fundamental error, 'a reasonable jury . . . *could* have reached a different [verdict].'" 250 Ariz. 543, ¶ 14 (quoting *Escalante*, 245 Ariz. 135, ¶ 29). In practice, the "could have affected" standard applicable to cumulative-error cases is the same as the prejudice inquiry in single-error cases.

¶109 This makes sense. I can think of no reason that multiple prosecutorial errors should harm the defendant by raising the standard for reversal. But that is just what the majority does. Its "profoundly distort" standard, which requires that the "injustice is obvious," is qualitatively higher than the "could have affected" standard articulated in *Robinson*. This is true even though the "could have affected" standard is difficult to satisfy and "necessarily excludes imaginative guesswork." *Escalante*, 245 Ariz. 135, ¶ 31. It is also true even though *Robinson*'s standard includes the

requirement that the cumulative errors "infect the trial with unfairness" such that the "resulting conviction [is] a denial of due process." *Robinson*, 253 Ariz. 121, ¶ 64.

**¶110**        Our concurring colleague argues that applying the "could have affected" standard to determining cumulative error "seems simply to replace step two" of the *Escalante* analysis with "step three." There is merit to this point, and it reinforces the value of clarification from our supreme court. But as I have explained, I do not see the majority's view as consistent with our supreme court's case law either. In fact, *Murray* describes step two of the prosecutorial-error inquiry as "similar to *Escalante*'s prejudice requirement," which is step three in the *Escalante* analysis. *Murray*, 250 Ariz. 543, ¶ 15. And the majority's standard has the added disadvantage of raising the reversal standard for cumulative error beyond the standard for cases of single errors. While I agree with my colleagues that the cumulative-error standard is demanding, it is not more demanding simply because more errors occurred.

**¶111**        Also, despite the majority's contrary view, we are not required in this analysis to view the facts "in the light most favorable to sustaining the jury's verdicts." That is instead how we view facts in determining whether substantial evidence supports a verdict. *See, e.g.*, *Payne*, 233 Ariz. 484, ¶ 76. Even the case cited by the majority, *State v. Fierro*, 254 Ariz. 35, ¶ 2 (2022), uses the "light most favorable" language simply for the purpose of describing a case's facts. I have found no cases suggesting that we must view the facts in this light in determining whether errors affected the verdict or otherwise deprived the defendant of a fair trial. Requiring us to do so would heighten the defendant's burden even further. Disputed evidence would automatically favor the state, even if the jury might have viewed that evidence differently without the errors.

## B.    Applying the standard

**¶112**        Whether the cumulative effect of the errors requires reversal is a close question. Even ignoring the evidence tainted by prosecutorial error, considerable evidence suggests that Romero was the shooter. A juror viewing the videos together could use them to track the shooter through the parking lot to the car that drove off, then conclude that Romero must have been the shooter because he was later found in that car. That is especially significant because police arrested him after a car chase in possession of a gun that had fired casings matching those near the area where the victim was shot. And Romero's car can plausibly—though not clearly—be matched to the car entered by the shooter in the surveillance

video. I have little doubt that based on that evidence, a reasonable jury could have concluded beyond a reasonable doubt that Romero was the shooter.

¶113 But that is not the issue. The standard instead requires us to determine whether a reasonable jury could have reached a different verdict absent the errors, such that a due-process violation occurred. I conclude that Romero has satisfied this standard. The key videos are too grainy to show the shooter's face or any identifying characteristics other than a generic outfit. And while the shooter's outfit is consistent with Romero's, the outfit was common among patrons at the nightclub. A witness had testified that "a large percentage of the crowd" was dressed similarly. To address this shortcoming, a juror could reasonably have ascribed significant credibility to Brumitt's improper identification.

¶114 This is especially possible because the ballistics evidence is not conclusive. A jury could conclude that this evidence established only that Romero fired shots. While those might have been the shots that killed S.H., Romero points out that forty-three shell casings were recovered from the nightclub's parking lot. It is also unknown how many additional casings might have been removed before police secured the scene. And importantly, no projectiles or fragments were recovered from S.H.'s body, nor was there proof of which shots killed him. A forensic pathologist could not even determine the caliber of bullet. And the prosecutor improperly strengthened the value of the ballistics testimony through his introduction of the NIBIN evidence.

¶115 Given the improper testimony identifying Romero and the weaknesses in the ballistics evidence, I believe that absent the errors, a reasonable jury could have concluded that the state failed to meet its burden of proving Romero's guilt beyond a reasonable doubt. And because this evidence went directly to the case's key factual dispute, I also believe it infected the trial with error to the extent that it denied Romero due process. *Cf. State v. Bible*, 175 Ariz. 549, 601 (1993) (looking to whether improper statement "tipped the scales of justice and denied Defendant a fair trial"). I would therefore reverse Romero's conviction and remand for a new trial.